# 22-2933

## United States Court of Appeals
## for the Second Circuit

JIMMIE HARDAWAY, JR., LARRY A. BOYD, FIREARMS POLICY COALITION, INC.,
SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*,

v.

STEVEN A. NIGRELLI, in his official capacity as
Superintendent of the New York State Police,

*Defendant-Appellant*,

BRIAN D. SEAMAN, in his official capacity as District Attorney for
the County of Niagara, New York, JOHN J. FLYNN, in his official capacity as
District Attorney for the County of Erie, New York.

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of New York

## BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
JONATHAN D. HITSOUS
 *Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
The Capitol
Albany, New York 12224
(518) 776-2044

Dated: January 17, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

PRELIMINARY STATEMENT ................................................. 1

JURISDICTIONAL STATEMENT ........................................... 3

ISSUES PRESENTED ............................................................. 4

STATEMENT OF THE CASE ................................................... 4

    A.   Legal Background ...................................................... 4

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* .......................... 4

        2.   New York's prohibition on firearms in places of worship ..... 6

    B.   Procedural Background ............................................ 7

    C.   The District Court's Preliminary-Injunction Ruling................ 9

STANDARD OF REVIEW....................................................... 11

SUMMARY OF ARGUMENT ................................................ 12

ARGUMENT ......................................................................... 15

POINT I

PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION........................................... 15

    A.   The Place-of-Worship Provision Is Presumptively Lawful. ... 15

    B.   The Place-of-Worship Provision Is a Sensitive-Place Restriction That Is Consistent with the Historical Tradition of Firearms Regulation........................................... 19

i

**Page**

1.  Places of worship have long been regarded as
    sensitive places. ............................................................ 20

2.  Places of worship are sufficiently analogous to
    other sensitive locations. .............................................. 29

POINT II

THE DISTRICT COURT ERRED IN APPLYING THE REMAINING
PRELIMINARY-INJUNCTION FACTORS ...................................................... 36

A.  Plaintiffs Have Not Demonstrated Irreparable Harm
    Absent a Preliminary Injunction. ......................................... 37

B.  The Preliminary Injunction Harms the Public Interest. ....... 40

CONCLUSION ........................................................................ 47

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Andrews v. State,*
   50 Tenn. 165 (1871) ...................................................................23-24

*Baird v. Bonta,*
   No. 10-cv-617, 2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) .............. 45

*Bonidy v. United States Postal Serv.,*
   790 F.3d 1121 (10th Cir. 2015) .....................................................17-18

*Brody v. Village of Port Chester,*
   261 F.3d 288 (2d Cir. 2001) .............................................................. 43

*Burg v. Gosselin,*
   591 F.3d 95 (2d Cir. 2010) ................................................................ 16

*Caswell v. Calderon,*
   363 F.3d 832 (9th Cir. 2004) ............................................................ 16

*Citibank, N.A. v. Citytrust,*
   756 F.2d 273 (2d Cir. 1985) .........................................................37-38

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ........................................................................... 44

*Dandridge v. Williams,*
   397 U.S. 471 (1970) ......................................................................... 43

*Defense Distributed v. Bonta,*
   No. 22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)........... 46

*District of Columbia v. Heller,*
   554 U.S. 570 (2008)............................................... 12, 17-18, 27, 34, 41

*English v. State,*
   35 Tex. 473 (1871)......................................................................23, 33

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
   559 F.3d 110 (2d Cir. 2009) .............................................................. 39

## Cases                                                          Page(s)

*Fields v. City of Tulsa,*
    753 F.3d 1000 (10th Cir. 2014) ........................................................ 16

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) .................................................... 40, 45

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs,*
    788 F.3d 1318 (11th Cir. 2015) ........................................................ 45

*Goff v. Harper,*
    60 F.3d 518 (8th Cir. 1995) .............................................................. 39

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,*
    764 F.3d 210 (2d Cir. 2014) ............................................................ 11

*Hill v. State,*
    53 Ga. 472 (1874) .......................................................................... 23

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) .............................................................. 42

*Kansas v. Hendricks,*
    521 U.S. 346 (1997).......................................................................... 17

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
    141 S. Ct. 2038 (2021)...................................................................... 28

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)................................................................... 17, 28

*NAACP, Inc. v. Town of E. Haven,*
    70 F.3d 219 (2d Cir. 1995) .............................................................. 37

*New York Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ....................................................... 11, 36

*New York State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ............................................................ 42

| Cases | Page(s) |

*New York State Rifle & Pistol Association v. Bruen,*
142 S. Ct. 2111 (2022) ................................................................. passim

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................................ 36

*Owens v. State,*
3 Tex. App. 404 (1878) ................................................................... 23

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
686 F.3d 889 (8th Cir. 2012) ......................................................... 16

*Ramos v. Louisiana,*
140 S. Ct. 1390 (2020) ................................................................... 28

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. 2010) ............................................................ 37

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
411 U.S. 1 (1973) ............................................................................ 34

*Scotts Co. v. United Indus. Corp.,*
315 F.3d 264 (4th Cir. 2002) ......................................................... 18

*Sussman v. Crawford,*
488 F.3d 136 (2d Cir. 2007) ................................................. 11-12, 15

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) ........................................................................ 31

*Timbs v. Indiana,*
139 S. Ct. 682 (2019) ..................................................................... 28

*Time Warner Cable of N.Y.C. v. Bloomberg L.P.,*
118 F.3d 917 (2d Cir. 1997) .......................................................... 40

*Tough Traveler, Ltd. v. Outbound Prods.,*
60 F.3d 964 (2d Cir. 1995) ............................................................ 37

| **Cases** | **Page(s)** |

*Trammel v. United States,*
   445 U.S. 40 (1980) .................................................................. 31-32

*United States Sec. & Exch. Comm'n v. Citigroup Glob. Mkts., Inc.,*
   752 F.3d 285 (2d Cir. 2014) ............................................... 44

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019) ........................................... 17

*United States v. Smythe,*
   363 F.3d 127 (2d Cir. 2004) ............................................... 41

*Walter v. State,*
   25 Ohio Cir. Dec. 567 (Cir. Ct. 1905) ............................... 24

*We The Patriots USA, Inc. v. Hochul,*
   17 F.4th 266 (2d Cir. 2021) ............................................... 35

*Wilson v. State,*
   33 Ark. 557 (1878) ............................................................. 23

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ............................................................... 40

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) ............. 41

## Laws

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.) ........................... 6

C.P.L.R. 4505 .................................................................................. 31

Penal Law
   § 265.01-e ................................................................................ 1, 6
   § 265.03 .................................................................................... 4
   § 265.20 .................................................................................... 4
   § 400.00 .................................................................................... 4

**Laws** **Page(s)**

*States (alphabetical)*

Act No. 13, 1889 Ariz. Terr. Sess. Laws 16................................................21

Act No. 285, 1870 Ga. Laws 421 ..........................................................21, 35

Penal Code of the State of Idaho § 4781 (1901) ......................................22

Act re Carrying Concealed Weapons, 1874 Mo. Laws 43.......................21

Okla. Terr. Stat. ch. 25, art. 47 (1891).....................................................22

Ch. 22, 1869 Tenn. Pub. Acts 23 (1st Sess.) ...........................................22

Ch. 46, 1870 Tex. Gen. Laws 63 (Called Sess.)................................21, 35

Ch. 7, 1877 Va. Acts 301 (1877-1878 Assembly, 2d Sess.) ....................21

*English*

4 Hen. 4, c. 29 (1403) ................................................................................30

26 Hen. 8, c. 6 (1534) ................................................................................30

The Statute of Northampton of 1328, 2 Edw. 3, c. 3 (1328) ..................29

**Miscellaneous Authorities**

Christine P. Bartholomew, *Exorcising the Clergy Privilege*,
   103 Va. L. Rev. 1015 (2017)................................................................31

Faith Cmtys. Today & Hartford Inst. for Religion Rsch., *Religious
   Education During the Pandemic: A Tale of Challenge and
   Creativity* (Apr. 2022), https://www.covidreligionresearch.org/
   wp-content/uploads/2022/04/Religious-Education-During-the-
   Pandemic_April-2022.pdf ..................................................................32

Patrick J. Charles, *The Fugazi Second Amendment* (2022)
   (forthcoming Clev. St. L. Rev.),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4222490...........30

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). As relevant to this case, the CCIA prohibits firearms in certain "sensitive locations," including "any place of worship or religious observation." N.Y. Penal Law § 265.01-e(2)(c).

Three months after the law was enacted and six weeks after it took effect, four plaintiffs—two individual clergy members and two gun-rights organizations—sued to challenge the place-of-worship provision as unconstitutional under the Second and Fourteenth Amendments. The U.S. District Court for the Western District of New York (Sinatra, J.) preliminarily enjoined defendant Steven A. Nigrelli, in his official capacity as Acting Superintendent of the New York State Police, from enforcing the provision on a statewide basis.[1] This Court should reverse.

---

[1] The injunction also applies to defendants Brian D. Seaman, in his official capacity as the District Attorney for Niagara County, New York, and John J. Flynn, in his official capacity as District Attorney for Erie

*(continued on the next page)*

First, the Supreme Court has recognized that sensitive-location restrictions are presumptively lawful. The district court, however, failed to analyze the place-of-worship provision under this presumption, and instead assumed that the statute implicated the text of the Second Amendment and immediately shifted the burden to defendants to support the prohibition with historical evidence.

Second, the State demonstrated that it properly identified the provision concerning places of worship as a "sensitive place" restriction, of a type that is consistent with the historical tradition of firearms regulation. It did so in at least two different ways, either of which provides an independent basis for rejecting plaintiffs' constitutional arguments. First, the State identified numerous statutes and judicial precedents from the nineteenth century that allowed for a prohibition on firearms in places of worship, whose validity has never been called into doubt. Second, the State introduced evidence that places of worship were analogous to other locations historically recognized as sensitive, including places expressly

_____

County, New York. Defendants Seaman and Flynn have not appealed from the preliminary injunction.

2

identified in *Bruen*. On either theory, the State easily made the showing required by *Bruen*.

Finally, the district court erred in its application of the remaining preliminary-injunction factors. Among other things, the Court improperly speculated that plaintiffs would suffer irreparable harm absent an injunction and improperly based its public-interest finding on its policy disagreements with New York's elected leaders.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. Because the district court's order granting a preliminary injunction is an appealable interlocutory order, this Court has jurisdiction under 28 U.S.C. § 1292(a). The notice of appeal is timely because it was filed on November 14, 2022, which was within 30 days of the district court's November 3, 2022, order. Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1.      Did plaintiffs fail to show a likelihood of success in their claim that the Second Amendment forbids identifying places of worship as sensitive locations where firearms can be restricted?

2.      Did plaintiffs fail to satisfy their burden with respect to the remaining preliminary-injunction factors?

## STATEMENT OF THE CASE

**A.    Legal Background**

**1.    The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen***

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). New York has long set forth basic eligibility criteria for a license, including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *Id.* § 400.00(1)(a)-(c).

Until recently, New York also required demonstrating "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar

4

as "proper cause" demanded showing "a special need for self-defense," this requirement implicated the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense and was invalid because it was unsupported by historical tradition. 142 S. Ct. at 2122, 2130-31. In so holding, *Bruen* rejected the framework previously used by nearly all federal courts of appeal to evaluate Second Amendment challenges in favor of a restated standard: if "the Second Amendment's plain text covers an individual's conduct," then the government seeking to regulate that conduct "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2129.

*Bruen* declined to "undertake an exhaustive historical analysis of the full scope of the Second Amendment." 142 S. Ct. at 2134 (quotation and alteration marks omitted). However, the Court "assume[d] it settled" that certain locations are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. The opinion endorsed such "'longstanding'" bans in schools, legislative assemblies, polling places, and courthouses, while recognizing that this list was non-exhaustive and "that modern regulations prohibiting the carry of fire-

5

arms in *new* and analogous sensitive places are constitutionally permissible." *Id.* The Court also made clear that its decision was not intended to be a "regulatory straightjacket" and that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern restrictions. *Id.* (emphasis omitted).

### 2.    New York's prohibition on firearms in places of worship

On July 1, 2022, the New York Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.).

As relevant here, the CCIA prohibits carrying "a firearm, rifle or shotgun" in several "sensitive location[s]," including in "any place of worship or religious observation." Penal Law § 265.01-e(1), (2)(c). The sensitive-location provisions do not apply to law-enforcement officers, military personnel, and armed security guards. *Id.* § 265.01-e(3). The sensitive-location provisions took effect on September 1, 2022.

6

**B.    Procedural Background**

On October 13, 2022, plaintiffs Jimmie Hardaway and Larry Boyd[2]

filed suit under 42 U.S.C. § 1983 in the Western District of New York

against Acting Superintendent Nigrelli and two district attorneys, all in

their official capacities, challenging the place-of-worship provision under

the Second and Fourteenth Amendments and seeking declaratory and

injunctive relief. (Joint Appendix (J.A.) 54, 73-75.) Plaintiffs asserted

that the provision barred "typical law-abiding individuals from carrying

loaded, operable handguns on their person in case of confrontation for

immediate self-defense." (J.A. 72.)

On October 14, plaintiffs moved for a temporary restraining order

and a preliminary injunction barring defendants from enforcing the

place-of-worship provision while the litigation was pending. (J.A. 99.)

The next day, the district court ordered defendants to respond to the

---

[2] The complaint was also filed on behalf of two out-of-state organizations, the Firearms Policy Coalition, Inc., and the Second Amendment Foundation. (J.A. 57-58.) Citing this Court's precedent on organizational standing, the district court considered only the allegations raised by the individual plaintiffs in its preliminary injunction ruling. (J.A. 11 n.3.) Unless otherwise specified, any references to "plaintiffs" in this brief pertain only to Hardaway and Boyd.

request for a temporary restraining order within four days, or by October 19. (J.A. 4.) On October 20, the district court issued a 40-page decision granting plaintiffs' request for a temporary restraining order pending the adjudication of the preliminary-injunction motion. The court gave defendants an additional eight days, or until October 28, to oppose the preliminary-injunction motion.[3] (J.A. 267.)

In opposition, the State offered the opinion of Patrick Charles, an expert in the history of American firearm regulations. (J.A. 149, 164-170.) Charles described historical sensitive places as locations where (1) political activity took place, (2) children were frequently present, (3) people were known to congregate, and (4) alcohol was consumed. (*See* J.A. 159-160.) Charles further identified restrictions on firearms in places of worship that had been enacted during the 19th century, which the State attached to his declaration. Charles observed that other States and localities had passed broader laws that necessarily encompassed places of worship. (J.A. 155-159, 172-216.) To Charles's knowledge, no court had ever invalidated any law prohibiting firearms in places of worship. (J.A. 160.)

---

[3] The district attorney defendants did not oppose a preliminary injunction but objected to any award of attorneys' fees. (J.A. 274, 276.)

8

## C.  The District Court's Preliminary-Injunction Ruling

On November 3, the district court issued a 44-page order granting the preliminary-injunction motion. (J.A. 9-52.)

First, the district court determined that plaintiffs were likely to succeed in establishing that the place-of-worship provision violated the Second Amendment. The court found that the Second Amendment presumptively guaranteed plaintiffs' right to carry arms for self-defense in public, including in places of worship. Because the place-of-worship provision prevented plaintiffs from exercising this perceived right, the court placed the burden on the State to marshal historical evidence to support the provision's constitutionality. (J.A. 36-37.)

The district court concluded that the State did not satisfy its burden. In the court's view, the place-of-worship provision was not relevantly analogous to legislative assemblies, polling places, and courthouses—sensitive places that *Bruen* identified—because those locations were all secure and implicated "key functions of democracy." (J.A. 38-39 (emphasis omitted).) Although the State had submitted an expert declaration from a historian identifying numerous historical prohibitions on firearms in places of worship, the court rejected these laws as "outliers" because they

9

came from only a "handful" of States and the court could not confirm how long they were in effect. (J.A. 41-43.) And the court expressed doubt about the probative value of these historical laws in any event because they were enacted during the Reconstruction era, rather than the Founding era. (J.A. 40-41.) The court further found that the laws cited by the State's expert conflicted with colonial-era laws that purportedly mandated guns in places of worship. (J.A. 43.)

Turning to the equitable factors, the district court found that plaintiffs had shown irreparable harm because the place-of-worship provision purportedly violated their right to bear arms, placed them at "the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the place of worship exclusion," and forced them to forego their Second Amendment rights to exercise their First Amendment rights. (J.A. 46-47.) The court additionally found that a preliminary injunction would not harm the public interest because the State failed to prove that firearms in places of worship posed a risk to public safety. (J.A. 47-48.)

The State appealed and moved for a stay pending appeal. This Court (Sack, Wesley, Bianco, JJ.) granted the stay, subject to a limitation, requested by the State, exempting from the place-of-worship provision

people licensed to carry firearms "who have been tasked with the duty to keep the peace" by their congregation's leadership. Order, CA2 ECF No. 53.

## STANDARD OF REVIEW

On appeal from an order granting injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,* 764 F.3d 210, 214 (2d Cir. 2014).

When determining a movant's entitlement to a preliminary injunction, courts consider whether (1) the movant is likely to succeed on the merits, (2) the movant will suffer irreparable harm absent an injunction (3) an injunction is in the public interest, and (4) there are other equities that weigh for or against an injunction. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). Where, as here, a preliminary injunction "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party is under a heightened standard to show a "clear" or "substantial" likelihood of success. *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation marks omitted). In any case, a "'preliminary injunction is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'" *Id.* at 139 (emphasis in original).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting a preliminary injunction.

The Supreme Court has recognized that sensitive-place regulations are presumptively lawful. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). The district court improperly relieved plaintiffs of their burden to overcome this presumption with respect to the place-of-worship provision.

In any event, the preliminary-injunction record makes clear that the place-of-worship provision is constitutional under the analogical comparison with history that *Bruen* directed the courts to undertake. Indeed, the State offered proof that places of worship have been recognized as sensitive places throughout history. Even on the district court's expedited briefing schedule, the State's expert identified at least six nineteenth-century state laws prohibiting firearms in places of worship and noted that no court had ever invalidated such a provision.

The district court summarily and erroneously dismissed these Reconstruction-era statutes as irrelevant "outliers" and identified a supposed conflict with colonial laws purportedly mandating firearms in places of worship. But nothing in *Bruen* suggests that some minimum number of historical precedents is necessary to justify a firearm regulation. Nor is there a conflict between the statutes identified by the State and certain colonial laws that purported to mandate firearms in churches. To the contrary, the colonial-era laws support the proposition that the presence (or non-presence) of firearms in places of worship has long been a matter appropriate for government regulation. Moreover, the district court's suggestion that the State's historical evidence lacks probative value because it comes from the nineteenth century is inconsistent with *Bruen*, which considered both Founding-era and Reconstruction-era laws in its analysis.

Further, the place-of-worship provision is relevantly similar to other sensitive locations in which firearms have historically been prohibited, including the locations expressly referenced in *Bruen* and its earlier decision in *District of Columbia v. Heller* (i.e., schools, government buildings, legislative assemblies, polling places, and courthouses). Historical

13

sensitive-place regulations served several purposes, including protecting places intended for the exercise of other constitutional rights; protecting places where vulnerable people such as children are frequently present; and protecting unusually crowded places where there is a risk of chaos from firearm-related fears or threats. Here too, the place-of-worship provision enables parishioners to exercise important constitutional rights free from disruption, protects children who receive on-site religious instruction, and minimizes chaos in crowded, indoor settings. The district court ignored these similarities based on an unfounded assumption that historical sensitive-places restrictions were limited to locations that offer independent security and implicate "key functions of democracy."

The district court's analysis of the equitable factors was similarly incorrect. The court improperly speculated that plaintiffs faced irreparable harm in the absence of a preliminary injunction because they would be unable to defend themselves in the event of a hypothetical mass shooting and because unidentified parishioners might forego attending religious services because they would prefer to be armed. At the same time, the court found that the injunction would be in the public interest because, in its view, the State had not made a sufficiently concrete showing that

14

the presence of firearms in houses of worship posed a threat to public safety. In so doing, the district court improperly substituted its own policy judgment for the decisions made by New York's elected leaders.

## ARGUMENT

## POINT I

### PLAINTIFFS FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE PLACE-OF-WORSHIP PROVISION

Plaintiffs failed to meet their heightened burden, *see Sussman*, 488 F.3d at 140, to show a likelihood of success on the merits of the Second Amendment claim, for several reasons.

## A.    The Place-of-Worship Provision Is Presumptively Lawful.

As an initial matter, the district court erroneously excused plaintiffs from showing that their desired conduct—to carry firearms in places of worship—was protected by the Second Amendment. Instead, the court immediately placed the burden on the State to support the challenged provision with historical evidence. (J.A. 36-37.) However, *Bruen* made clear that the government's obligation to defend a firearms regulation is trigged only "[w]hen the Second Amendment's plain text covers an

individual's conduct." 142 S. Ct. at 2129-30. To this end, the Supreme Court held the Second Amendment's plain text covered the right of "ordinary, law-abiding, adult citizens" to "'bear' arms in public for self-defense." *Id.* at 2134-35. Accordingly, the Court in *Bruen* "canvassed the historical record" to confirm that plaintiffs made this predicate showing before shifting the burden to the State to provide historical support for the challenged proper-cause restriction. *Id.* at 2127, 2130.

This approach is consistent with the analytical approach to other constitutional claims. For example, courts require First Amendment plaintiffs to make a threshold showing that a regulation burdens religious rights or "speech." *See Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012). A Fourth Amendment plaintiff claiming to have endured a government-initiated "seizure" must likewise first show that a seizure occurred within the meaning of the Constitution. *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010). Similarly, a plaintiff who claims that the government drew a "distinction" that violates the Equal Protection Clause must show first show that the Equal Protection Clause encompasses such distinctions. *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004).

And the Ex Post Facto Clause requires a threshold showing that a measure is punitive. *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).

In this case, New York has defined places of worship as "sensitive locations." The Supreme Court has repeatedly explained that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful" and outside the "scope of the Second Amendment." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 142 S. Ct. at 2133; *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). Other courts analyzing sensitive-place laws have similarly concluded that "the Second Amendment does not give [persons] the right to bear arms in" a sensitive location, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4, or that the Second Amendment "does not apply" to such restrictions, *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1125-26 (10th Cir. 2015).

Without grappling with any of this precedent, the district court relieved plaintiffs of their burden to establish the applicability of the Second Amendment to this dispute by rebutting the presumption of constitutionality for sensitive-place restrictions. Instead, the court

concluded that the Second Amendment applied here insofar as it protects the right of a law-abiding and responsible citizen to carry arms for self-defense in public, and that places of worship are "in public." (J.A. 37.) Such reasoning is insufficient given that many of the sensitive locations identified as outside the scope of the Second Amendment by the Supreme Court and other courts of appeals are also open to the public. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133 (courthouses and legislative assemblies); *Heller*, 554 U.S. at 626-27 (government buildings); *Bonidy*, 790 F.3d at 1125-26 (U.S. Post Office grounds).

Had the district court appropriately held plaintiffs to their burden, it would have been constrained to conclude that plaintiffs failed to establish a substantial likelihood of success. Plaintiffs' stated desire to carry firearms to their respective churches (J.A. 108, 111) is not sufficient to rebut a presumption of constitutionality: if places of worship are legitimate sensitive locations, then plaintiffs have no Second Amendment right to carry firearms therein. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280-81 (4th Cir. 2002) (district court abused its discretion by issuing preliminary injunction in reliance on evidence that was immaterial to the merits question).

**B.    The Place-of-Worship Provision Is a Sensitive-Place Restriction That Is Consistent with the Historical Tradition of Firearms Regulation.**

In any event, even if the district court's threshold analysis was correct, the historical evidence presented by the State amply demonstrated that places of worship are sensitive places within which restrictions on firearms are consistent with the Nation's history and tradition of firearms regulation.

Although *Bruen* declined to "comprehensively define" sensitive places for purposes of the Second Amendment analysis, 142 S. Ct. at 2133, it instructed lower courts on how to review such laws. First, the Court invited use of analogies to historical sensitive places to "determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis in original). Second, the Court observed that historical analysis requires courts to focus their inquiry on "how and why the regulations burden a law-abiding citizen's right to armed self-defense," i.e., "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. And third, the court clarified that this analogical reasoning

19

"requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133 (emphasis in original).

Here, the State identified numerous examples of historical restrictions on the possession of firearms in places of worship. These examples alone were enough to satisfy *Bruen*'s standard. Moreover, the State showed that places of worship were relevantly similar to other locations long recognized as sensitive, including by *Bruen*. Therefore, plaintiffs could not have established a likelihood of success on the merits of their Second Amendment challenge even in the absence of the State's ample historical evidence as to restrictions in places of worship.

### 1. Places of worship have long been regarded as sensitive places.

As set forth above, *Bruen* permits a court to uphold a modern sensitive-place restriction when it is relevantly similar to sensitive-place restrictions that have historical recognition. It follows, then, that when the record shows that the challenged firearm law applies to a location

that has *itself* been recognized in history as a sensitive place where firearm regulation is lawful, that will be compelling evidence that the law is constitutional. The State offered exactly this kind of evidence here, notwithstanding the unrealistically compressed briefing schedule set by the district court.

In particular, the State identified nineteenth-century laws from six States that imposed prohibitions on carrying firearms into places of worship. In 1870, Texas enacted a law criminalizing the possession of firearms in "any church or religious assembly." Ch. 46, 1870 Tex. Gen. Laws 63, 63 (Called Sess.) (see J.A. 195). Around the same time, Georgia enacted a law prohibiting any "deadly weapon," including pistols and revolvers, in "place[s] of public worship." Act No. 285, 1870 Ga. Laws 421, 421 (see J.A. 191). Four years later, Missouri banned concealed firearms in "any church or place where people have assembled for religious worship." Act re Carrying Concealed Weapons, 1874 Mo. Laws 43, 43 (see J.A. 157). In 1877, Virginia followed suit. Ch. 7, 1877 Va. Acts 301, 305 (1877-1878 Assembly, 2d Sess.) (see J.A. 206). Arizona barred pistols and other fire-arms from places of religious assembly in 1889. Act No. 13, 1889 Ariz. Terr. Sess. Laws 16, 17 (see J.A. 211). And the next year, Oklahoma made

21

it unlawful to carry weapons, including firearms, into places of worship. Okla. Terr. Stat. ch. 25, art. 47 (1891) (see J.A. 215-216). In addition to these state-level statutes, an array of localities in Kansas, Missouri, and North Carolina passed ordinances during this time period that prohibited firearms in places of worship. (J.A. 155-158.)

As Patrick Charles, the State's expert historian, explained, several other jurisdictions had broader restrictions that also precluded firearms in places of worship. (J.A. 156-157.) For example, an 1869 Tennessee law prohibited firearms in any "public assembly of the people." Ch. 22, 1869 Tenn. Pub. Acts 23, 23 (1st Sess.). Likewise, an 1889 Idaho law prohibited carrying arms in cities and towns altogether. *See* Penal Code of the State of Idaho § 4781 (1901). And laws from localities in Kansas and Utah prohibited guns within city limits, which would have encompassed places of worship. (J.A. 156; *see also* J.A. 158-159.)

Charles further explained that there is no evidence that any court ever upheld a challenge to the authority of state or local governments to regulate firearms in places of worship. (J.A. 160.) To the contrary, the Texas Supreme Court found it "little short of ridiculous" to claim a right to carry "into a peaceable public assembly, as, for instance, into a church,

22

a lecture room, a ball room, or any other place where ladies and gentle-men are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1871); *see also Owens v. State*, 3 Tex. App. 404, 407 (1878) ("no excuse" for "wear-ing deadly weapons to church, or in a ball-room, or other places mentioned" in Texas's statute, because "lives of innocent people there assembled [may be] placed in jeopardy").

The Georgia Supreme Court elaborated: "carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). The Tennessee Supreme Court similarly held that "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appro-priate use of them." *Andrews v. State*, 50 Tenn. 165, 182 (1871); *see also Wilson v. State*, 33 Ark. 557, 560 (1878) ("No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc."). And an Ohio appellate court observed that laws that "prohibit carrying fire arms into churches, courthouses, theaters

and polling places" do not infringe upon the right to bear arms.[4] *Walter v. State*, 25 Ohio Cir. Dec. 567, 568 (Cir. Ct. 1905).

Faced with these unrefuted historical facts, the district court none-theless set aside these laws and judicial precedents as "outliers." (J.A. 42-45.) Unfortunately, the district court declined to explain what rendered the historical laws "outliers," leaving the State to guess as to how it could ever satisfy *Bruen*'s historical inquiry. To the extent the district court's references to the "handful" of historical laws the State offered (J.A. 42-43) suggest that the court simply found them to be too few in number, such a conclusion is incorrect as both a factual and a legal matter. Between the statutes and judicial decisions, it would appear that firearm regula-tions virtually identical to the place-of-worship provision were accepted

---

[4] Although some of the state courts referenced here did not recog-nize the Second Amendment to apply against the States in the nineteenth century, their States typically had state constitutional provisions analo-gous to the Second Amendment, and the courts decided these cases pursu-ant to those state constitutional provisions. Because the courts typically held "that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the Federal and State Constitu-tions," *e.g.*, *Andrews*, 50 Tenn. at 177, the courts' understanding of the analogous state constitutional provisions sheds important light on contem-porary understandings of the Second Amendment, as well as its state analogues.

in all or part of at least 14 States—more than a "handful" by any measure. In any case, the historical analysis that *Bruen* directed is not synonymous with a numbers game—least of all when the State's burden is simply to show that the place-of-worship provision is relevantly analogous to historically recognized sensitive locations. Indeed, the State did not need to identify even a single "historical twin" to support a modern regulation. *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). Thus, *Bruen* cannot reasonably support an order invalidating a law restricting firearms based on a finding that the enacting jurisdiction has not offered *enough* historical twins.

Likewise, *Bruen* imposed no requirement that historical laws be "continu[ing]" for some undefined period of time, contrary to the district court's conclusion. (*See* J.A. 41-43 (quotation marks omitted).) Both *Bruen* and *Heller* regarded sensitive-place regulations to *already* be part of an American tradition of firearm regulation. By inviting courts to consider and uphold "new" sensitive-place regulations, the *Bruen* Court necessarily recognized that some sensitive places did not exist—and some might not have developed characteristics that made them "sensitive"—until relatively recent times. *See* 142 S. Ct. at 2133. The district court's tortured

25

logic, by contrast, results in a catch-22 where new sensitive places are unconstitutional unless they have always been sensitive places.

Nor did it matter that some of the laws cited by the State were later repealed. (*See* J.A. 42-43.) Just as political leaders could reasonably determine as a policy matter that circumstances render a location "sensitive," they can likewise determine that circumstances have changed. Such policy judgments do not affect the undisputed fact that a State's *power* to regulate firearms in places of worship, as the circumstances warrant, has gone unquestioned until now.

The district court's reliance on seventeenth-century rules mandating that people bring firearms to church in certain circumstances was similarly mistaken. (*See* J.A. 43.) The State's expert historian explained—and plaintiffs did not refute—that these laws largely were written to maintain the institution of slavery, and not to protect an underlying right to carry or bear arms. (J.A. 160-161.) Moreover, laws mandating guns in places of worship cannot logically signify a right to be free from government interference in the bearing of arms, which is what the Second Amendment codifies. If anything, these colonial laws support the opposite inference, insofar as they amount to a government-imposed obligation. Further, at

26

least one colonial law on which plaintiffs relied comes from Georgia (Pls.' Mem. in Supp. of Mot. for TRO & Prelim. Inj. at 11-12 ("TRO Mem."), Dist. Ct. ECF No. 9-1), a State that thereafter prohibited guns at places of worship (*see* J.A. 191). In other words, both before and after the States ratified the Second Amendment, they did not understand the regulation of firearms in places of worship as a policy option that was "off the table." *See Heller*, 554 U.S. at 636.

Contrary to the district court's remarks (J.A. 40-41, 43), the fact that the State's proffer consisted of Reconstruction-era laws entitled it to no less weight. Whatever debate may exist as to whether Founding-era or Reconstruction-era history *controls* as to the understanding of constitutional rights incorporated through the Fourteenth Amendment, the Supreme Court has never held that Reconstruction-era history is irrelevant to that understanding. In fact, the Court observed that public-carry restrictions were not in wide effect until after the Second Amendment's ratification, but nonetheless devoted a discrete section to an assessment of "[e]vidence from around the adoption of the Fourteenth Amendment." *Bruen*, 142 S. Ct. at 2145, 2150. And with respect to sensitive places in particular, the Court referred to "18th- *and 19th- century*" sensitive places

27

as the starting point for historical analogues.[5] *Id.* at 2133 (emphasis added); *see also McDonald*, 561 U.S. at 770-78 (2010) (evaluating nineteenth-century history in determining that the Second Amendment was incorporated against the States).

As in *Bruen*, this case ultimately presents no occasion to choose between Founding-era and Reconstruction-era history, because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to" places of worship. *See* 142 S. Ct. at 2138. Here, *all* of the available history demonstrates that governments could regulate the possession of guns in places of

---

[5] This approach is consistent with the Court's use of historical materials from the time of the Fourteenth Amendment's ratification to inform its understanding of other constitutional rights that the Fourteenth Amendment incorporated against States. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (consulting nineteenth-century treatises in support of holding that Fourteenth Amendment requires unanimous jury verdicts to convict a defendant of a serious crime); *Timbs v. Indiana*, 139 S. Ct. 682, 688-89 (2019) (relying on 1868 understanding of the Eighth Amendment to hold that the Fourteenth Amendment incorporated the Excessive Fines Clause); *see also Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2059 (2021) (Thomas, J., dissenting) ("I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass.") (quotation and alteration marks omitted).

worship. Where there was nothing to suggest that the public understanding was any different in 1791, the district court was mistaken to treat the State's proffered evidence as anything but a reflection of national consensus on governments' power to restrict the ability to bear arms in places of worship.

### 2. Places of worship are sufficiently analogous to other sensitive locations.

The State's evidence that the place-of-worship provision is virtually identical to historical restrictions on firearms in places of worship is ample proof that the provision is constitutional under the analogical standard that *Bruen* imposed. Even without this proof, however, the place-of-worship provision would be constitutional because it closely resembles other sensitive locations where firearms have historically been prohibited, including the locations expressly identified in *Bruen*.

The historical record amassed to date evinces a longstanding tradition of restricting guns in sensitive locations. Beginning with our English ancestors, governments restricted or prohibited people from carrying arms at fairs, at markets, while in transit, before judges and other government officials, and in churches. *See* The Statute of Northampton of 1328, 2

Edw. 3, c. 3 (1328); 4 Hen. 4, c. 29 (1403); 26 Hen. 8, c. 6, § 3 (1534). These sensitive-place restrictions emigrated to what became the United States, expanded to include schools, and proliferated in the mid-to-late nineteenth century as advances in weapons gave rise to police-power regulations. (*See* J.A. 154-155 (citing Founding-era laws from several States prohibiting armed assemblies).) *See* Patrick J. Charles, *The Fugazi Second Amendment* 88-90 & n.419 (2022) (forthcoming Clev. St. L. Rev.).[6] As *Bruen* recognized, there is "no dispute[] regarding the lawfulness" of prohibitions on firearms in places like schools, legislative assemblies, polling places, and courthouses. 142 S. Ct. at 2133.

As Charles explained in his expert declaration below, historical sensitive-place restrictions generally, though not exclusively, fall into three categories: (1) locations that society has deemed worthy of special protection from the disruption caused by firearms because of other constitutional interests, such as voting, legislating, and access to courts; (2) locations containing vulnerable people who could not reasonably be expected to use firearms for self-defense; and (3) locations where the use

---

[6] For sources available online, full URLs appear in the Table of Authorities. All URLs were last visited on January 17, 2023.

of firearms, even by ordinary citizens for self-defense, was substantially more likely to increase, rather than decrease, the risk of causalities. (*See* J.A. 159-160.)

Places of worship can properly be considered part of each of these groups. First, places of worship are centers for the exercise of religion, one of the most cherished individual rights in American society. The "Free Exercise Clause . . . by its terms, gives special protection to the exercise of religion." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 713 (1981). This special protection extends to worship as a congregation, as well as to individualized spiritual guidance. Indeed, countless people consult clergy on a host of deeply personal decisions. Christine P. Bartholomew, *Exorcising the Clergy Privilege*, 103 Va. L. Rev. 1015, 1071 (2017) ("clergy remain a primary source of advice and guidance on everything from legal guidance to marital problems"). Both federal and state law recognize that communications between clergy and parishioners are privileged. *See Trammel v. United States*, 445 U.S. 40, 51 (1980); N.Y. C.P.L.R. 4505. This is borne out of a recognition of "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed

31

to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel*, 440 U.S. at 51.

The possession of loaded firearms in places of worship would have a disruptive effect on these critical activities and could interfere with the relationship between clergy and parishioners. For example, parishioners may decline to attend services out of fear of armed conflict in enclosed spaces. Similarly, clergy may decline to give controversial or sensitive advice to parishioners out of a fear of escalating a disagreement into armed conflict. As the concern that firearms may chill constitutionally protected voting activity renders polling places sensitive, so too may the concern about interfering with religious exercise render places of worship sensitive.

Second, places of worship often are frequented by young children who cannot reasonably be expected to protect themselves. Many places of worship offer programming for religious instruction. By one measure, up to 88% of Christian churches offered religious instruction for children. Faith Cmtys. Today & Hartford Inst. for Religion Rsch., *Religious Education During the Pandemic: A Tale of Challenge and Creativity* 2 (Apr. 2022). Although many of these programs would likely not come within Penal

Law § 265.01-e(2)(m)'s independent designation of schools as sensitive places, they are materially indistinct from the archetypal school setting where groups of children receive classroom instruction from a teacher.

Third, religious services are a paradigmatic form of public assembly. Whether the facility is large or small, multiple people come together to worship as a congregation, usually indoors. Although plaintiffs want to carry firearms in church for self-defense, as a matter of sheer mechanics, armed "self-defense" in this setting ordinarily would involve discharging a gun into a crowd of congregants. And apart from injuries caused by stray bullets, an armed confrontation could result in causalities related to terrified congregants clamoring to escape the sanctuary. Simply put, the "self-defense" plaintiffs desire is just as likely to produce unnecessary causalities as it is to prevent them. Thus, at least one court has branded it as "little short of ridiculous" to assert a right to carry a firearm into "a peaceable public assembly, *as, for instance, into a church.*" *English*, 35 Tex. at 478-79 (emphasis added).

In short, the "how and why" of the place-of-worship provision mirrors the "how and why" of the other longstanding sensitive places that *Bruen* identified.

33

According to the district court, places of worship are not analogous to the types of sensitive places recognized in *Bruen* because they are not "secure[]" and do not implicate "key functions of democracy." (J.A. 38 (emphasis omitted).) The source from which the district court extracted these limitations remains unclear. They did not originate in *Bruen*, which declined to enumerate any qualities that would render a place "sensitive." *See* 142 S. Ct. at 2133. If the Supreme Court believed that sensitive places were limited to those that were secure and implicated key functions of democracy, it would have said so before broadly endorsing the recognition of new sensitive places by way of historical analogy.

If anything, the Supreme Court's remarks about sensitive places to date indicate that its conception of such locations is far broader than the district court perceives. For example, both *Bruen* and *Heller* identified "schools" among sensitive places. *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Yet schools do not uniformly offer their own security, and it is unlikely that the justification for including schools was to protect a "key function of democracy," given that the U.S. Constitution does not recognize a right to education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-36 (1973). *Bruen* also rejected the argument that

34

police presence was sufficient to render a place sensitive without further suggesting that police presence was nonetheless a necessary condition for that designation. 142 S. Ct. at 2134. And even though the Supreme Court has identified polling places as a quintessential sensitive place, some of the same statutes prohibiting firearms at polling places simultaneously prohibited them in other places that were open to the public, including places of worship. *See, e.g.*, Ch. 46, 1870 Tex. Gen. Laws 63; Act No. 285, 1870 Ga. Laws 421.

Having cited no historical or legal authority to support its conclusion, the district court improperly superimposed unfounded limits on the "how and why" that could support sensitive-place regulations. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 292-93 (2d Cir.) (district court erred in granting preliminary injunction when it could not draw the relevant conclusions without resorting to speculation), *clarified by* 17 F.4th 368 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2569 (2022). Amplifying the magnitude of the error, the district court's ill-advised limits could render invalid common-sense regulations on firearms in nurseries, hospital emergency rooms, and airplane cabins—none of which boast their own armed security or are considered integral to democracy. Specifically

quoting language discussing sensitive places, two justices in *Bruen*'s six-justice majority wrote separately to underscore that the Second Amendment continues to permit a "variety" of gun regulations. 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quotation marks omitted). Therefore, it is unlikely that the *Bruen* majority would endorse the district court's analysis.

## POINT II

### THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY-INJUNCTION FACTORS

A party seeking a preliminary injunction must separately show a likelihood of irreparable harm in the absence of an injunction, that a preliminary injunction serves the public interest, and that the balance of other equities weighs in favor of a preliminary injunction. *New York Progress & Prot. PAC*, 733 F.3d at 486. Where the party opposing a preliminary injunction is a government entity, harm to the nonmoving party and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The scant materials in plaintiffs' motion papers failed to satisfy their burden as to any of these factors.

## A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent a Preliminary Injunction.

This Court considers irreparable harm in the event an injunction is not granted "to be the most important prerequisite for the issuance of a preliminary injunction." *NAACP, Inc. v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). To assess whether a plaintiff has shown irreparable harm, "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quotation marks omitted). The case for an injunction is at its strongest when it is apparent that the challenged action will permanently alter the parties' rights before a court has an opportunity to resolve that challenge. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

Plaintiffs have not satisfied their burden to show irreparable harm. As an initial matter, plaintiffs' delay in filing this action and seeking preliminary-injunctive relief weighs strongly against an injunction. *See, e.g.*, *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Plaintiffs inexplicably waited until October 13, 2022, to file this

37

suit—three months after the CCIA was enacted and six weeks after the place-of-worship provision took effect. See *supra* at 6-7. A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A.*, 756 F.2d at 277 (quotation marks omitted).

Even absent delay, plaintiffs have failed to make their showing. According to plaintiffs, they want to bring guns into their churches to protect themselves and others from potential violence but cannot do so while the place-of-worship provision remains in effect. (J.A. 107-108, 111-113.) Plaintiffs' allegations convinced the district court that the place-of-worship provision forced them to "give up their rights to armed self-defense outside the home, being left to the mercy of opportunistic, lawless individuals who might prey on them and have no concern about the place of worship exclusion." (J.A. 46.) But neither plaintiffs nor the district court explained why Penal Law § 265-e(3)'s exception allowing armed security guards in sensitive places would not mitigate these concerns. Nor did plaintiffs profess it to be impossible or impracticable to comply with the CCIA by employing security guards. The district court's conclu-

sion was therefore based wholly on speculation. *See Faiveley Transp.
Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 120 (2d Cir. 2009) (vacating
preliminary injunction premised on the district court's speculation of the
risk the movant faced).

The district court similarly speculated when it surmised that the
place-of-worship provision could force law-abiding citizens to choose
between their Second Amendment and First Amendment rights. Plaintiffs
have failed to describe any alteration to the way that they worship or
provide spiritual guidance resulting from the CCIA. They do not identify
any parishioners who have expressed concerns about their safety or left
the congregation in the CCIA's aftermath, much less explain why these
parishioners would not return if plaintiffs ultimately prevailed. Indeed,
plaintiffs do not indicate that any of their parishioners agree with their
enthusiasm for armed worship. Consequently, "[e]ven assuming the
[forced choice] alleged would be irreparable, the threat of this harm is too
remote" to support a preliminary injunction. *Goff v. Harper*, 60 F.3d 518,
521 (8th Cir. 1995).

To the extent the district court suggested that plaintiffs' inability
to exercise their Second Amendment right to carry firearms is itself

irreparable harm, such a conclusion improperly conflates the merits with the independent irreparable-harm prong of the preliminary-injunction standard. Faced with a similar argument in a First Amendment case, this Court observed that while "impairment of First Amendment rights can undoubtedly constitute irreparable injury," it is nonetheless "more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of N.Y.C. v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996 n.2 (9th Cir. 2015) (despite asserting Second Amendment claim, plaintiff conceded that he would not suffer irreparable harm).

## B.    The Preliminary Injunction Harms the Public Interest.

"[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks omitted). Otherwise, courts risk needlessly interfering with laudable policy goals based on a superficial impression that the plaintiff might succeed. *Time*

40

*Warner Cable*, 118 F.3d at 929. The moving party must therefore convince the court that the requested preliminary injunction would not harm the public interest. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012).

Plaintiffs failed to make such a showing here. Instead, plaintiffs merely asserted that it was in the public interest to "vindicate that the Second Amendment is not a second-class right" by enjoining the enforcement of a statute that impairs "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." (TRO Mem. at 16 (quotation marks omitted).) Plaintiffs miss the point: the Second Amendment has never entitled anyone, including law-abiding citizens, to carry firearms in sensitive places. *See Bruen*, 142 S. Ct. at 2133. It hardly diminishes the Second Amendment to leave in place a statute that falls within a group of laws the Supreme Court has identified as presumptively lawful, while considering whether plaintiffs have rebutted that presumption.

Conversely, the preliminary injunction increases the risk of gun violence. Throughout the nation, it is well settled that more guns lead to more shootings. *See, e.g.*, *Heller*, 554 U.S. at 693-99 (Breyer, J., dissenting) (detailing research linking firearms to casualties); *United States v.*

41

*Smythe*, 363 F.3d 127, 129 (2d Cir. 2004) (federal criminal law recognizes that "the mere presence of a gun" creates a risk of violence) (quotation and alteration marks omitted). This Court has observed that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention," and that the State's gun regulations substantially serve those interests. *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). Although *Bruen* overruled *Kachalsky*'s holding that these interests can affect the scope of the Second Amendment's protections, 142 S. Ct. at 2126-27, it did not repudiate the basic premise that firearm regulations do in fact serve the public interest.

For this reason, the district court's remark that "the State does not show that the carrying of firearms at places of worship has resulted in an increase in handgun violence" (J.A. 47) is misplaced. "[T]he legislature is 'far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) (quotation marks omitted). And this includes the prediction that the proliferation of guns in places of worship will increase gun-related injuries and deaths. The

district court also overlooked the State's proffer of incidents—in both places of worship and other sensitive places (State's Mem. of Law in Opp'n to Pl.'s Mot. for a Prelim. Inj. at 21 & nn.13-18, Dist. Ct. ECF No. 40)— where the presence of guns caused garden-variety disagreements between law-abiding citizens to escalate into unnecessary shootings, *see Brody v. Village of Port Chester*, 261 F.3d 288, 290-91 (2d Cir. 2001) (vacating preliminary injunction where district court failed to consider the harm of further delay to the defendant village).

In light of the documented risk of spontaneous and accidental violence, the district court's doubts about the place-of-worship provision's ability to curb mass shootings (J.A. 46-47) are irrelevant. The Constitution "does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970). In any event, the district court failed to consider how the place-of-worship provision's exception for armed security guards could reduce the risk of such shootings.

Nor can the district court decide for itself that "[t]he public has a significant interest in the strong sense of the safety that a licensed concealed handgun regularly provides, or would provide." (*See* J.A. 47-48

43

(quotation marks omitted).) This conclusion represents nothing more than the district court's policy view that a proliferation of guns would deter violence. New York's elected leaders have decided otherwise. "Federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones." *United States Sec. & Exch. Comm'n v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (quotation and alteration marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (federal courts should exhibit restraint when asked to use their equitable power to interfere with States' enforcement of their own laws). Few cases illustrate the necessity of such restraint as does this case, where an unelected district court judge has enjoined the State from enforcing a duly enacted state law because he disagrees with the wisdom of that law.

Finally, the public interest favors the State because continued enforcement of the place-of-worship provision promotes *Bruen*'s call for courts to conduct careful historical analysis. The Supreme Court cautioned that the historical analysis it required from the lower courts "can be

44

difficult," especially when applying historically informed "constitutional principles to novel modern conditions." *Bruen*, 142 S. Ct. at 2134 (quotation marks omitted). Indeed, the State's expert historian explained in his supporting declaration that much of the historical material has been lost to time, and what materials are available are discovered through time-consuming archival research. (J.A. 151-152.) The upshot is that the historical analysis of firearm regulations should not be completed in haste.

Even before *Bruen*, courts have warned that preliminary injunctions are ill-suited vehicles for the historical analysis that Second Amendment cases demand. *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1324 (11th Cir. 2015) (upholding the denial of a preliminary injunction and remitting for further development of the factual record); *Fyock*, 779 F.3d at 997 & n.3 (observing that "[a]s the merits action proceeds and the parties develop the record, the district court will be able to adequately assess the historical roots" of the firearm regulation). And since *Bruen*, district courts facing requests to enjoin firearm regulations have likewise observed that the accelerated timeline of a preliminary injunction would not produce an adequate record on which to review the merits. *See Baird v. Bonta*, No. 10-cv-617, 2022 WL 17542432, at *8 (E.D.

45

Cal. Dec. 8, 2022) (movants have not shown it is better to upend the status quo while court "conduct[s] the type of searching historical surveys that the Supreme Court's approach requires") (quotation and alteration marks omitted); *Defense Distributed v. Bonta*, No. 22-cv-6200, 2022 WL 15524977, at *5 & n.9 (C.D. Cal. Oct. 21) (denying preliminary injunction where "there is no possibility" that the State could "present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)"), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

The district court, on the other hand, gave the State merely four days to offer evidence in defense of the place-of-worship provision before issuing a temporary restraining order. (J.A. 4, 6-7.) After giving the State just eight more days to respond to the motion for a preliminary injunction, the court issued the underlying order in which it assailed the State for offering what it deemed was an insufficient record. The resolution of *Bruen*'s application to modern firearms regulations deserves more than a rapid-fire litigation schedule and snap judgments.

# CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction against enforcement of the place-of-worship provision.

Dated:  Albany, New York
         January 17, 2023

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General*
                                      *State of New York*
                                    Attorney for Appellant


                             By:   */s/ Jonathan D. Hitsous*
                                    JONATHAN D. HITSOUS
                                    Assistant Solicitor General

BARBARA D. UNDERWOOD               The Capitol
  *Solicitor General*              Albany, New York 12224
ESTER MURDUKHAYEVA                 (518) 776-2044
  *Deputy Solicitor General*
JONATHAN D. HITSOUS
  *Assistant Solicitor General*
     *of Counsel*

47

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 9,021 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

       */s/ Kelly Cheung*