# 22-2933

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

JIMMIE HARDAWAY, JR., LARRY A. BOYD, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees*

- v. -

STEVEN A. NIGRELLI, in his Official Capacity as Acting Superintendent of the New York State Police,

*Defendant-Appellant*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the Western District of New York, No. 1:22-cv-0771 (Sinatra, J.)

## BRIEF OF AMICI CURIAE GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY, AND MARCH FOR OUR LIVES IN SUPPORT OF APPELLANTS AND REVERSAL

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com

*Counsel for Amici Curiae*
*Giffords Law Center to Prevent Gun*
*Violence, Brady, and March for Our*
*Lives*

*(Caption continues from front cover.)*

BRIAN D. SEAMAN, *in his official capacity as District Attorney for the County of Niagara, New York,* JOHN J. FLYNN, *in his official capacity as District Attorney for the County of Erie, New York,*

*Defendants-Appellees.*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.........................................................................i

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF AMICI CURIAE......................................................... 1

INTRODUCTION ............................................................................... 4

ARGUMENT ....................................................................................... 6

I.    New York's Prohibition on Firearms in Places of Worship is Consistent with the Constitution's Structure and Purpose. ........................... 6

II.   This Court Should Correct the Lower Court's Improper Application of the *Bruen* Test. .............................................................................. 9

     A.    The Circuit Courts Must Articulate a Workable Test Under *Bruen*. ................................................................................. 9

     B.    The District Court Erred in its Application of *Bruen* ........................ 14

CONCLUSION .................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul*,
  2022 WL 16744700 (N.D.N.Y.) .......................................................................2

*Antonyuk v. Nigrelli*,
  No. 22-2908, Dkt. No. 190 (2d Cir.) ................................................................5

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) .............................................................................2

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)......................................................................................2, 3

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  45 F.4th 306 (D.C. Cir. 2022)...........................................................................3

*Hardaway v. Nigrelli*,
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) .................................6, 15, 16, 17

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019)..............................................2

*Libertarian Party v. Cuomo*,
  970 F.3d 106 (2d Cir. 2020) .............................................................................2

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)..........................................................................................2

*Md. Shall Issue v. Hogan*,
  353 F. Sup. 3d 400, 403-05 (D. Md. 2018) .......................................................2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...............................................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc v. City of New York*,
  140 S. Ct. 1525 (2020)......................................................................................3

*Peruta v. County of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) (Graber, J., concurring) ......................2

*Stimmel v. Sessions*,
   879 F.3d 198 (6th Cir. 2018) ................................................................2

*United States v. Perez-Gallan*,
   2022 WL 16858516 (W.D. Tex. Nov. 10, 2022)...............................10

*Wade v. University of Michigan*,
   MSC No. 156150 (Mich.) ......................................................................3

**Other Authorities**

America, *House of Worship Shootings*, https://bit.ly/3XM5bVs ...........................17

*Churches. We Mapped Them.*, Christianity Today (October 2, 2022),
   https://bit.ly/3Hq6mEW ........................................................................6

Dahlia Lithwick & Mark Joseph Stern, *The Guns Won* ...........................................7

Ezra Klein, *Why We're Polarized* (2020) .................................................................7

Grace Kay, *A Majority of Americans Surveyed Believe the US Is in the
   Midst of a 'Cold' Civil War* ..................................................................7

Gregory P. Magarian, *Conflicting Reports: When Gun Rights
   Threaten Free Speech*, 83 Law & Contemp. Probs. 169, 169 (2020) .................7

*Michigan Cancels Legislative Session to Avoid Armed Protesters* ..........................7

Tori Luecking, *DHS Launches Panel on Religious Security as Hateful
   Incidents Rise*, Wash. Post (Nov. 3, 2022) ...........................................7

## INTEREST OF AMICI CURIAE[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a). No counsel for a party authored this brief in whole or in part; no counsel or party made a monetary contribution to fund its preparation or submission; and no person other than Amicus, its members, or its counsel made a monetary contribution to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E); Local R. 29.1(b).

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party v. Cuomo*, 970 F.3d 106 (2d Cir. 2020); *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y.). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta v. County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue v. Hogan*, 353 F. Sup. 3d 400, 403-05 (D. Md. 2018).

*Amicus curiae* Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady has filed amicus

briefs in many cases involving the regulation of firearms, including *Bruen*, 142 S. Ct. 2111 (2022); *Heller*, 554 U.S. 570 (2008), and *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (D.C. Cir. 2022).

*Amicus curiae* March For Our Lives Foundation ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protest against gun violence in the nation's history. From its Road to Change initiative that registered 50,000 new voters in 2018 to its successful advocacy for dozens of state, local, and federal laws, MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all. These young people—all too familiar with mass shootings and other forms of gun violence—have a vital interest in ensuring that the Constitution is correctly interpreted to allow for the enactment of reasonable gun violence prevention measures, including public carry licensing regimes, to protect all Americans.

MFOL has participated as amicus curiae in other cases that affect its core interest in preventing gun violence. It has filed amicus briefs in *Bruen*, 142 S. Ct. 2111 (2022); *New York State Rifle & Pistol Ass'n, Inc v. City of New York*, 140 S. Ct. 1525 (2020), and *Wade v. University of Michigan*, MSC No. 156150 (Mich.).

3

# INTRODUCTION

As the Supreme Court has held, law-abiding, responsible citizens have a right to carry firearms, but that right is not unlimited.

The heart of this case raises issues regarding the intersection of the First and Second Amendments. The district court recognized that certain First Amendment rights warrant firearms restrictions, namely, rights provided by the right to speech and assembly clauses, acknowledging that firearms could rightfully be banned in civic locations precisely because of the important First Amendment activity that takes place there. But it gave no consideration to the chilling effect the presence of firearms in places of worship has on the exercise of critical First Amendment rights, according second-class status to the free exercise clause. This elevation of the Second Amendment above certain First Amendment activity is inappropriate and contrary to the Constitution's structure and purpose.

Further, the district court did not properly apply the standard articulated in *Bruen*. In *Bruen*, the Supreme Court explained that courts should undertake a historical analysis when considering constitutional attacks against regulations that allegedly impinge upon the Second and Fourteenth Amendments. Recognizing that modern regulations often will not have a corresponding "historical twin," the Court endorsed an approach that allows for analogical reasoning, examining the "hows" and "whys" of modern and historical gun regulations to determine if they

are in keeping with the "balance struck by the founding generation" and later generations, including around the time of Reconstruction. The standard under *Bruen* does not require a surface-level historical match for a modern regulation. Instead, the test is whether the *motivation underlying* modern regulations (the why) and *methods used* by modern regulations (the how) are in line with the balance struck by earlier generations. The motivations underlying *historical* regulations and the methods used by such regulations in the past will inform this inquiry. The district court here, and district courts throughout this Circuit, have failed to properly apply *Bruen*, and this Court is well-poised to articulate the correct standard.

Giffords Law Center, Brady, and MFOL (*amici*) submit this brief in addition to their *amicus curiae* brief filed in *Antonyuk v. Nigrelli*, No. 22-2908, Dkt. No. 190 (2d Cir.), which has been ordered to be heard in tandem with the present case. In addition to the arguments in the *Antonyuk* brief regarding the correct application of the standard articulated in *Bruen* and the relevance of scientific evidence in *Bruen*'s analogical inquiry, *amici* write separately here to address the tensions raised between the First and Second Amendments by this case, and to explain the district court's errors in applying the proper *Bruen* standard, as detailed in the *Antonyuk* brief.

**ARGUMENT**

I.    **New York's Prohibition on Firearms in Places of Worship is Consistent with the Constitution's Structure and Purpose.**

The district court justified the Supreme Court-sanctioned prohibitions on firearms in legislative assemblies, polling places, and courthouses in part because they are civic locations "where a bad-intentioned armed person could disrupt key functions of democracy."[2] *Hardaway v. Nigrelli*, 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (emphasis removed). These key functions of democracy may be critical to exercising First Amendment rights, but so are religious freedoms. The Second Amendment may "not [be] a second-class right," *Bruen*, 142 S. Ct. at 2156, but neither is the First Amendment—any portion of it.

In our constitutional system, First Amendment rights are the lifeblood of democracy. They nurture political discourse, debate, resistance, and progress. The Second Amendment as interpreted by the district court—without its historical limitations—risks a direct collision with core First Amendment protections. If more people are allowed to carry guns in more public places, including places of worship, without establishing proper cause for doing so, it will become much more

---

[2] Ironically, given its emphasis of this point, the district court did not acknowledge that religious spaces are commonly used for secular community activities, including activities that are central to the function of democracy. For example, in 2020, 20% of polling places nationwide were located in church buildings, including 9% of the polling places in New York. Daniel Sillman and Jared Boggess, *20% of Polling Places Are in Churches. We Mapped Them.*, Christianity Today (October 2, 2022), https://bit.ly/3Hq6mEW.

dangerous to speak, assemble, pray, or express controversial ideas in public settings.  *See* Gregory P. Magarian, *Conflicting Reports: When Gun Rights Threaten Free Speech*, 83 Law & Contemp. Probs. 169, 169 (2020) ("In the real world . . . guns far more commonly impede and chill free speech than protect or promote it.").  Those who have historically been silenced—including religious minorities—may experience an especially intense chilling effect.  *See Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown Rsch. & Pol'y (Aug. 23, 2021).  In practice, the abstract promise of First Amendment rights affords little assurance against hostile listeners bearing concealed handguns or tactical rifles for "self-defense."  Recent experience proves the point.  *See* David Welch, *Michigan Cancels Legislative Session to Avoid Armed Protesters*, Bloomberg News (May 14, 2020); Dahlia Lithwick & Mark Joseph Stern, *The Guns Won*, Slate (Aug. 14, 2017) ("When the police are literally too afraid of armed protesters to stop a melee, First Amendment values are diminished; discussion is supplanted by disorder and even death . . . .").

Attacks on places of worship have increased in recent years.  *See* Grace Kay, *A Majority of Americans Surveyed Believe the US Is in the Midst of a 'Cold' Civil War*, Bus. Insider (Jan. 14, 2021); Ezra Klein, *Why We're Polarized* (2020); *see also* Tori Luecking, *DHS Launches Panel on Religious Security as Hateful Incidents Rise*, Wash. Post (Nov. 3, 2022) (noting that "FBI hate crime statistics

show that incidents in churches, synagogues, temples and mosques increased 34.8 percent between 2014 and 2018").  In these circumstances, a single moment of hatred could lead to tragedy.  Now more than ever—as weapons possessed for self-defense are repurposed as tools to censor and intimidate—cities and states must be able to appropriately regulate the public carrying of firearms.  Only then can we safely enjoy our historic First Amendment rights, and collectively pursue the Constitution's promise of democracy.

To be sure, there are those who reach the opposite conclusion, insisting that the rise in social discord makes it more urgent to find a right for everyone to carry a firearm anywhere in the public sphere.  That approach marks a path toward vigilantism squarely inconsistent with the constitutional plan.  Moreover, the resolution of such debates is for legislative bodies to resolve, not courts.

Substantial experience, and scientific research, teaches that firearms are unlikely to provide an antidote to the strife and polarization of our age.  When carried in public, they too often magnify the risk of violence where calm and understanding are desperately needed.  In cases where guns do succeed in "cooling" tempers, they do so by terrifying others into retreat or suppressing the exercise of First Amendment rights.

The First and Second Amendments can coexist harmoniously.  But the district court's decision needlessly brings them into conflict.  The Constitution

does not demand primacy of Second Amendment rights over First Amendment rights exercised in public, whether in a civic location or house of worship. And it does not leave the American people powerless to address gun violence and the misuse of lethal force for self-defense. The First Amendment protects the right of people to freely practice their religion and the Second Amendment cannot take that right away.

## II. This Court Should Correct the Lower Court's Improper Application of the *Bruen* Test.

### A. The Circuit Courts Must Articulate a Workable Test Under *Bruen*.

In *Bruen*, the Supreme Court set out a historical test for evaluating the constitutionality of firearm regulations. 142 S. Ct. at 2126. It begins with a threshold inquiry, identifying the relevant course of conduct and asking whether the "plain text" of the Second Amendment protects that conduct (an inquiry for which the plaintiff challenging the regulation bears the burden), and then proceeds to an analogical inquiry comparing modern and historical laws. Thus far, and as exemplified by the district court's decision here, district courts are flailing in their attempts to correctly understand and apply *Bruen*'s historical test. In their confusion, some district courts have misunderstood this test to involve nothing more than a superficial comparison between modern regulations and historical

ones.  This approach has led to rigid analyses that are not consistent with the considerably more nuanced approach that the *Bruen* Court mandated.

As an example, consider *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022), currently on appeal, concerning the constitutionality of a statute that, in order to primarily protect vulnerable women and children exposed to special dangers, restricts certain domestic abusers' access to firearms.  In trying to apply *Bruen*, the court there reached a conclusion that cannot reasonably be viewed as consistent with what the framing generation intended to accomplish through adoption of the Second Amendment.  To the contrary, historical evidence indisputably reveals that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at *11.  The district court nonetheless incorrectly struck down the federal statute at issue because the historical record lacked specific evidence of the "federal government's disarmament of *domestic abusers*." *Id.* at *12 (emphasis added).  In reaching this result, the district court failed to set reasoned parameters for the analogical inquiry.  Societal judgments about what constituted domestic abuse in 1791 bear little or no resemblance to the current judgments about that serious problem.  Rather, the "nuanced approach" to the *Bruen* analogical inquiry should have focused on using societal judgments regarding violence and dangerousness as a measure for who may be armed, then and now.  *See Bruen*, 142 S. Ct. at 2132 (acknowledging that

10

"other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach").

The muddled reasoning behind such lower-court decisions puts Second Amendment jurisprudence in precisely the kind of "regulatory straightjacket" that *Bruen* disclaimed. *Id.* at 2133. Properly understood, *Bruen*'s test does not call for the kind of surface-level historical matching game that these district courts have played. Instead, a proper application of *Bruen*'s standard requires courts to consider the *motivation underlying* regulations and the *methods used* by the regulations to determine whether modern regulations are in line with the balance struck by earlier generations. The steps required for this deeper inquiry are set out in *Bruen*.

At the outset, the *Bruen* Court instructed that modern regulations implicating conduct covered by the "plain text" of the Second Amendment must be "*consistent with* this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added). A modern regulation is "consistent" with this historical tradition if it is "analogous" to—although not necessarily a "twin" of or "dead ringer" for—historical regulations. *Id.* at 2133. When explaining the analogical method to use, the Court identified two relevant metrics: the "how" and the "why" of the regulation's effect on Second Amendment rights. *Id.* Assessing and weighing a challenged regulation's "how" and "why" is necessary to determine whether the

11

regulation imposes a "comparable burden" that is "comparably justified" when compared with founding-era restrictions. *Id.* If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional. *Id.* at 2133 n.7.

Naturally, determining whether the regulation's "how" and "why" are in keeping with this "balance" requires courts to identify and apply the relevant considerations that the legislature took into account. On one side are the undeniably strong governmental interests in protecting public safety, or what *Bruen* calls the regulation's "why." *Id.* at 2133. On the other side is the way in which the regulation limits Second-Amendment rights to achieve that interest— what *Bruen* calls the regulation's "how." *Id.* Courts applying *Bruen* must look closely into these considerations and determine whether the historical and modern laws are relevantly analogous. *Id.* at 2132–33.

Thus, the underlying motivation for the regulation—its "why"—is critical to *Bruen*'s test. One of the key errors in district court opinions such as the cases cited above—as well as the ruling below here—is that they have failed to properly assess and, importantly, *analogize* the reason for the regulations they have considered.

This case presents an ideal opportunity for this Court to correct these errors by setting out a workable template for how courts in the Second Circuit are to

apply *Bruen*. This case is an excellent example of these issues because it concerns the same regulatory context that the Supreme Court considered in *Bruen*, as well as a licensing scheme written to meet the *Bruen* Court's specific guidance about what would make such a regulation constitutional. Thus, this case allows this Court to elaborate on its application of *Bruen* consistent with the *Bruen* Court's instructions. In addition, and as explained in more detail below, the district court's erroneous application of *Bruen* here is a prime example of what the *Bruen* test is *not*. By reversing the lower court and setting out the proper standard, this Court will clarify the standard for other courts to follow in considering challenges to legislatively enacted restrictions implicating the Second Amendment.

The emphasis on an *analogical* inquiry, as opposed to a one-to-one match or other more rigid method of comparison, is of critical importance. Inherent in the *Bruen* methodology is a recognition of the massive differences between the circumstances faced by 18th-, 19th-, and even early 20th-century legislatures and those faced by legislatures today. Technological and societal changes have drastically altered the harms that legislators must address with firearms regulations. Modern gun violence would have been as foreign to legislators of centuries past as the notion of space travel. The greater the "unprecedented societal concerns or dramatic technological changes" addressed by the modern legislature, the more

critical it is to use the "more nuanced approach" to the analogical inquiry that *Bruen* expressly dictates. *Id.* at 2132.

**B.    The District Court Erred in its Application of *Bruen*.**

The district court failed to perform the analogical inquiry that *Bruen* mandates in at least three ways, leading to its erroneous conclusions.

***First***, the district court drew unsupported analogical rules from the historical regulations that it consulted. As the *Bruen* Court made clear, it has been "settled" since the founding that there are certain "sensitive places" where "arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133. The Court pronounced this historical fact based on evidence of "18th- and 19th-century 'sensitive places' where weapons were altogether prohibited," including "legislative assemblies, polling places, and courthouses." *Id.* Moreover, the *Bruen* majority emphasized that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133 (emphasis in original).

Despite the clear historical record establishing a tradition of firearm prohibitions in sensitive places, as well as *Bruen*'s invitation to explore analogies to new sensitive places, *id.*, the district court veered in a different direction. Without citing *Bruen*—much less the text of the Second Amendment, or historical

14

evidence—the district court extracted from the historical prohibitions cited by
*Bruen* the rule that the Second Amendment allows firearm bans in places that are
"sporadically visited," but not in places that "members of the public frequent."
*Hardaway*, 2022 WL 16646220, at \*14.  Further, and equally without support, the
district court decided that the historical prohibitions that *Bruen* cited only authorize
regulations that safeguard "key functions of democracy," and in places "where
government officials are present and vulnerable to attack."  *Id.* (emphasis
removed).  This kind of capricious rule-making by a court has no place in the
analogical inquiry required by *Bruen*.

  ***Second***, the district court failed to properly consider the "why" behind either
the historical sensitive-places regulations or the current New York law.  The
court's improperly constructed analogical rules lack support in the text or historical
evidence. They also are the product of the court's singular focus on the *present
character* of legislative assemblies, polling places, courthouses, and places of
worship.  The court noted that places of worship "*are* unsecured, spiritual places
that members of the public frequent," and legislative assemblies, polling places,
and courthouses *are* civic locations sporadically visited in general, and "*are*
typically secured locations."  *Id.* (emphasis added).  The court made no effort to
determine whether these present-day characteristics of places of worship and civic
locations were in line with their historical character, and thus did not consider the

15

motivations behind 18th- and 19th-century firearm bans in these spaces—motivations *Bruen* requires the court to parse. Nor did the district court inquire adequately into the purpose of similar prohibitions in religious establishments today.

While the court did not conduct the necessary inquiry into the "how" and "why" of these sensitive location restrictions, it nonetheless made assumptions about religious establishments today: citing no evidence, the court stated that firearms regulations are not needed in houses of worship because they are not places that "aggregate and concentrate adversarial emotions." *Id.* at *14.

This is assumption is plainly contradicted by reality. "Adversarial emotions" resulting in deadly shootings are all too common in places of worship today.[3] Because the court failed to properly assess the characteristics of either these modern locations or their historic predecessors, it did not meaningfully evaluate the "why" of their firearms restrictions as required by *Bruen*. This failure also requires reversal.

**Third,** the district court assumed that the "societal problem" addressed in the New York law is "the same" as problems that have existed throughout history, and

---

[3] As recent, tragic examples, consider the shooting that left eleven dead at the Tree of Life Synagogue in Pittsburgh, Pennsylvania in 2018, the shooting that left twenty-six dead at First Baptist Church in Sutherland Springs, Texas in 2017, or the shooting that left nine dead at Emanuel African Methodist Episcopal Church in Charleston, South Carolina in 2015.

noted that the Supreme Court decided in *Heller* and *Bruen* that such problems do not justify certain regulations. *Id.* at *14. But contrary to the district court's assumption, neither *Heller* nor *Bruen* considered regulations designed to address the specific societal problem at issue here: the threat of shootings in modern New York religious establishments. Because the court ignored that the New York law addresses a new societal problem, it did not consider whether recognizing places of worship as sensitive places, and prohibiting firearms in such places of worship, is a response to a new societal problem not contemplated at the time of ratification of the Second or Fourteenth Amendments.

Religious diversity in America has expanded greatly since the ratification of the Second and Fourteenth Amendments. The diversity introduces conflicts the Founders did not contemplate. *See* Voice of America, *House of Worship Shootings*, https://bit.ly/3XM5bVs. According to a study by the Violence Project, 46% of all shootings that occurred in a house of worship from 1966 to February 2020 were motivated by religious hate, and the percentage of mass shootings motivated by religious hate rose markedly across the years. *Id.* (noting that from 1966 to 2000, 1% of all mass shootings in America were motivated by religious hate; from 2000 to 2014, 9% of all mass shootings in America were motivated by religious hate; and from 2018 to February 2020, 17% of all mass shootings were motivated by religious hate). This "unprecedented societal concern . . . require[s] a

more nuanced approach" under *Bruen*, which the district court did not employ.

142 S. Ct. at 2132.

## CONCLUSION

This Court should reverse the district court's order granting the preliminary

injunction.

*/s/ P. Benjamin Duke*
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Ave.
New York, NY 10018
Tel: (212) 841-1000
pbduke@cov.com
*Counsel for Giffords Law Center to*
*Prevent Gun Violence, Brady, and*
*March for Our Lives*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief contains 3,762 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and has been prepared in proportionally spaced typeface using 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word-processing system in preparing this certificate.

Dated:  January 24, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2023, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished on them via the appellate CM/ECF system.

Dated:  January 24, 2023

*/s/ P. Benjamin Duke*
P. Benjamin Duke
