# 22-2933

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JIMMIE HARDAWAY, JR., LARRY A. BOYD, FIREARMS POLICY COALITION, INC., SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellees,*

v.

STEVEN A. NIGRELLI, in his official capacity as Superintendent of the New York State Police,

*Defendant-Appellant,*

v.

BRIAN D. SEAMAN, in his official capacity as District Attorney for the County of Niagara, New York, JOHN J. FLYNN, in his official capacity as District Attorney for the County of Erie, New York,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK, NO. 22-CV-771

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 18 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

AUSTIN KNUDSEN
*Attorney General of Montana*

CHRISTIAN B. CORRIGAN
*Solicitor General*

MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
peter.torstensen@mt.gov

PETER M. TORSTENSEN, JR.
*Assistant Solicitor General*

*Attorneys for Amicus Curiae State of Montana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................ii

INTERESTS OF AMICI CURIAE ..........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

ARGUMENT ......................................................................................3

I. New York fails to show that its place-of-worship restriction is consistent with this Nation's historical tradition of firearm regulation. ....................................................................................3

   A.New York fails to identify a longstanding, historical tradition of completely prohibiting firearm possession in places of worship.......................................................................................6

      1. New York fails to identify any similar or analogous restrictions between 1791 and 1868............................................8

      2. New York's limited historical evidence of similar place-of-worship restrictions fails to satisfy *Bruen*'s historical inquiry......................................................................................9

      3. Recent place-of-worship statutes cut against broad prohibitions like New York's. ..................................................17

CONCLUSION ..................................................................................20

CERTIFICATE OF COMPLIANCE........................................................23

## TABLE OF AUTHORITIES

### CASES

*Andrews v. State,*
50 Tenn. 165 (1871) ...................................................... 15, 16

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................ *passim*

*English v. State,*
35 Tex. 473 (1872) ............................................... 15–16, 16

*Gamble v. United States,*
139 S. Ct. 1960 (2019) ................................................. 17, 20

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) .................................. 7, 10

*Hill v. State,*
53 Ga. 472 (1874) ....................................................... 16, 17

*Konigsberg v. State Bar of Cal.,*
366 U.S. 36 (1961) ............................................................. 4

*McDonald v. City of Chi.,*
561 U.S. 742 (2010) ......................................................... 20

*New York State Rifle & Pistol Association v. Bruen,*
142 S. Ct. 2111 (2022) ........................................... *passim*

*Nnebe v. Daus,*
644 F.3d 147 (2d Cir. 2011) ............................................ 2

*Owens v. State,*
3 Tex. Ct. App. 404 (1878) ........................................... 13

*Wilson v. State,*
33 Ark. 557 (1878) ........................................................ 16

*Young v. Hawaii,*
896 F.3d 1044 (9th Cir. 2018) .................................. 15, 16

## OTHER AUTHORITIES

**United States Code**

42 U.S.C. § 1983 ................................................................ 2

**Statutes**

Ark. Code Ann. § 5-73-306(15) ...................................... 19

Ark. Code Ann. § 5-73-322(g)–(h) ................................. 19

D.C. Code § 7-2509.07(b)(2) .......................................... 19

Ga. Code Ann. § 16-11-127(b)(4) ................................... 19

La. Rev. Stat. § 40:1379.3(N) ........................................ 19

Miss. Code Ann. § 45-9-101(13) ..................................... 19

Miss. Code Ann. § 45-9-171(2)(a) .................................. 19

Mo. Rev. Stat. § 571.107(1)(14) ..................................... 19

N.D. Cent. Code § 62.1-02-05 ........................................ 19

N.Y. Penal Law §§ 265.01-e ...................................... 2, 18

Neb. Rev. Stat. § 69-2441(1)(a) ..................................... 18

Ohio Rev. Code Ann. § 2923.126(B)(6) .......................... 19

S.C. Code Ann. § 23-31-215(M)(8) ................................. 19

**Session Laws**

Ch. 46, 1870 Tex. Gen. Laws 63 ...................................... 9

Ch. 7, § 21,1877 Va. Acts 301 ....................................... 10

Act No. 285, 1870 Ga. Laws 421 ...................................... 9

## INTERESTS OF AMICI CURIAE

The States of Montana, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Hampshire, Oklahoma, South Carolina, South Dakota, Texas, West Virginia, and Wyoming (the "States") submit this amicus brief to safeguard individuals' "constitutional right to bear arms in public for self-defense" against unnecessary intrusions. *See New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2156 (2022). The States urge this Court to affirm the decision below.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *Bruen*, the U.S. Supreme Court held that the Second and Fourteenth Amendments protect an individual's right to carry a handgun in public for self-defense. *Id.* at 2122. And because New York's licensing regime conditioned the issuance of concealed-carry licenses on an applicant's showing of special need, which the record showed was a demanding standard, the Court held that New York's licensing regime was unconstitutional. *Id.* at 2122–23.

On the heels of *Bruen*, the New York Legislature passed the Concealed Carry Improvement Act ("CCIA") to update New York's firearm

licensing and possession laws. S.B. 1, 245th Leg., 1st Extraordinary Sess. (N.Y. 2022). The CCIA makes it a "class E felony" to possess a firearm in an area defined as a "sensitive location," including "any place of worship or religious observation." N.Y. Penal Law §§ 265.01-e, (1), (2)(c).

Reverend Jimmie Hardaway Jr. and Bishop Larry A. Boyd ("Plaintiffs"), joined by two institutional plaintiffs,[1] sued under 42 U.S.C. § 1983, claiming that New York's place-of-worship restriction was unconstitutional under the Second and Fourteenth Amendments. The district court preliminarily enjoined defendant Steven A. Nigrelli, in his official capacity as Acting Superintendent of the New York State Police, from enforcing the place-of-worship restriction.[2] It found that New York's reliance on a handful of state and territorial laws, enacted between 1870 and

---

[1] Because existing circuit precedent provides that an organization doesn't have standing to assert the rights of its members in cases brought under 42 U.S.C. § 1983, the district court's order focused only on the individual plaintiffs. J.A.11 n.3 (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)).

[2] The preliminary injunction also applies to Brian D. Seaman and John J. Flynn in their respective capacities as District Attorneys for Niagara and Erie County. Neither appealed the district court's order granting the preliminary injunction. Appellant's Br. 1–2 n.1.

1890, was insufficient to carry its burden of identifying an American tradition supporting its place-of-worship restriction.  J.A.36–45.

As the district court correctly concluded, New York failed to "affirmatively prove that its [place-of-worship] restriction is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.  As *Bruen* explained, the historical record supports a broad right to carry a firearm in public, subject to well-defined restrictions on the manner of carry and types of permissible arms, as well as longstanding "sensitive locations" where firearms could be broadly prohibited.  *See id.* at 2133, 2138, 2150, 2156.  Apart from a handful of state and territorial laws enacted during the late nineteenth century—nearly a century removed from the founding—the historical record doesn't show an "enduring American tradition" of restricting the right to carry firearms in places of worship.  *See id.* at 2155–56.

## ARGUMENT

## I. New York fails to show that its place-of-worship restriction is consistent with this Nation's historical tradition of firearm regulation.

*Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects

that conduct." 142 S. Ct. at 2126. The Second Amendment's plain text "protects [Plaintiffs'] proposed conduct—carrying handguns publicly for self-defense."[3]  *Id.* at 2134. To justify its place-of-worship restriction, New York "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

New York argues that its place-of-worship restriction regulates "sensitive places" in which firearms restrictions are already part of an enduring American tradition of firearm regulation.  *See* Appellant's Br. 19, 25. But "laws forbidding the carrying of firearms in sensitive places" must still be "longstanding" to be constitutionally permissible.  *See Bruen*, 142 S. Ct. at 2133 (quoting *District of Columbia v. Heller*, 554 U.S.

---

[3] New York tries to offload its burden of proving the existence of a historical tradition of similar regulations by defining Plaintiffs' proposed conduct as "carry[ing] firearms in places of worship." Appellant's Br. 15–18. By doing so, New York suggests that Plaintiffs must scour the historical record to find a similar right before any burden would ever shift to the state. This Court should reject New York's parlor trick and hold it to its burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

570, 626 (2008)).  To be sure, *Bruen* assumed that "it [was] settled" that certain locations—including schools, government buildings, and polling places—were "sensitive places" where carrying a firearm "could be prohibited consistent with the Second Amendment."  *Id.* at 2133.  But that list *excludes* churches or other places of worship, so New York must show that its place-of-worship restriction is part of an enduring American tradition of firearm regulation.[4]

When considering "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places," *Bruen* permits courts to use analogies to determine if regulating these "*new* … sensitive places" passes constitutional muster.  *Id.*  But reasoning by analogy is inappropriate here, where neither churches nor handguns are new, and where the possession of firearms in places of worship doesn't present any new regulatory concerns.  *See id.* at 2131 (explaining that, in some cases, the necessary historical inquiry "will be fairly straightforward," such as

---

[4] The omission of churches and other places of worship from the list of "sensitive places," while not dispositive, suggests that churches and other places of worship have not historically been viewed as "sensitive places." And there are at least two scholars who are skeptical that there is a persuasive "rationale for extending the 'sensitive places' doctrine to places that are not schools or government buildings."  D. Kopel & J. Greenlee, *The 'Sensitive Places' Doctrine*, 13 CHARLESTON L. REV. 205, 289 (2018).

"when a challenged regulation addresses a general societal problem that has persisted since the [eighteenth] century").

### A. New York fails to identify a longstanding, historical tradition of completely prohibiting firearm possession in places of worship.

Courts must follow the course charted by *Heller* and *Bruen* to determine whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding. That analysis requires courts to compare respondents' historical evidence with the "'historical precedent' from before, during, and even after the founding" to see if those historical materials show "a comparable tradition of regulation." *Id.* at 2131–32; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original)).

Even though New York's obligation to respect Plaintiffs' right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights and incorporated against the States after the Fourteenth Amendment's adoption "have the same scope as against the Federal Government." *Id.* at 2137. And the scope of

that right is generally "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *See id.* (collecting cases).

*Bruen* cautioned courts "against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. So, while a regular course of conduct *can*, in certain instances, "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

To determine whether New York has carried its burden to "affirmatively prove that its [place-of-worship] regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *see id.* at 2127, this Court must evaluate the historical evidence New York and its supporting State Amici offer in the following periods: (1) the founding era until the Fourteenth Amendment's adoption; (2) late nineteenth-century state and territorial laws and ordinances; and (3) late twentieth-century laws.

## 1. New York fails to identify any similar or analogous restrictions between 1791 and 1868.

*Heller* found that the Second Amendment, ratified in 1791, "codified a preexisting right" that "was regarded at the time of the Amendment's adoption as rooted in 'the natural right of resistance and self-preservation.'" *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 594). For that reason, historical evidence close in time to the Amendment's adoption provides the most relevant insight into its original meaning. *See id.* at 2137 (quoting *Heller*, 554 U.S. at 614). Yet New York offers *no evidence* of any historical place-of-worship regulation between 1791 and 1868. None. Because New York bears the burden to rebut Plaintiffs' presumptively constitutional right to bear arms in public, including at places of worship,[5] its failure to produce evidence of similar laws during this period strongly suggests no such tradition existed.

---

[5] "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right[.]" *See Bruen*, 142 S. Ct. at 2127; *see also id.* at 2150 (explaining that it is the State's, not courts', burden "to sift the historical materials for evidence to sustain" the challenged statute).

## 2. New York's limited historical evidence of similar place-of-worship restrictions fails to satisfy *Bruen*'s historical inquiry.

New York cobbles together a patchwork of late nineteenth-century historical evidence to support its place-of-worship restriction, including state and territorial statutes, local ordinances, and judicial precedent. On closer inspection, these sources provide little support for a historical tradition of similar place-of-worship restrictions. After all, "post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment," so "they do not provide as much insight into its original meaning as earlier sources." *Id.* at 2137.

***State Statutes.*** New York identified place-of-worship restrictions, enacted between 1870 and 1877, in four states—Texas, Georgia, Missouri, and Virginia. Appellant's Br. 21. In 1870, Texas and Georgia both enacted laws prohibiting the possession of pistols, revolvers, and other dangerous weapons in churches or other places of worship. *See* Ch. 46, 1870 Tex. Gen. Laws 63, 63 (Called Sess.) (J.A.195); Act. No. 285, 1870 Ga. Laws 421, 421 (J.A.191). Four years later, in 1874, Missouri enacted a similar law prohibiting possession of firearms or dangerous weapons in churches or other religious assemblies. *See* J.A.157 n.5. And

in 1877, Virginia enacted a substantially similar prohibition. *See* Ch.7, § 21,1877 Va. Acts 301, 305 (1877-1878 Assembly, 2d Sess.) (J.A.206).

But four statutes passed between 1870 and 1877 provide little insight into whether place-of-worship restrictions, like New York's, are consonant with the original meaning of the Second Amendment. *See Bruen*, 142 S. Ct. at 2136 (cautioning courts "against giving postenactment history more weight than it can rightly bear"). As *Bruen* explained, the historical evidence supported the existence of a broad right to carry firearms in public for self-defense. *See id.* at 2156. So, the "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text"—like the handful of laws identified in Texas, Georgia, Missouri, and Virginia—is insufficient to "overcome or alter that text." *See id.* (quoting *Heller*, 670 F.3d at 1274 n.6).

Another serious flaw in New York's case is that it fails to provide any indication of these statutes' duration. New York counters that "*Bruen* imposed no requirement that historical laws be 'continu[ing]' for some undefined period of time," nor does it matter that "some of the laws … were later repealed." *See* Appellant's Br. 25–26 (citation omitted). Instead, it claims that *Bruen* and *Heller* already "regarded

10

sensitive-place regulations … as a part of an American tradition of firearm regulation." *Id.* at 25.

But that argument fails on two fronts. *First*, as *Bruen* explained, "passing regulatory efforts" are insufficient to establish that such laws are "part of an *enduring* American tradition of state regulation." 142 S. Ct. at 2155 (emphasis added). Bottom line: longevity matters. *Second*, New York's failure to show more than a handful of similar place-of-worship restrictions, which were all passed over a seven-year period in the 1870s and nearly 80 years after the adoption of the Second Amendment, cuts deeply against its claim that its law is among the "'longstanding' 'laws forbidding the carrying of firearms in sensitive places.'" *Id.* at 2133 (quoting *Heller*, 554 U.S. at 626). All told, a handful of statutes of unknown duration fail to establish an "enduring American tradition of state regulation" of firearm possession in places of worship. *Id.* at 2155–56.

**Territorial Statutes.** New York also identified late nineteenth-century place-of-worship restrictions from two western territories—Arizona and Oklahoma. Appellant's Br. 21–22. In 1889, Arizona barred pistols or other firearms from "churches or other places of religious assembly." *See* Act No. 13, § 3, 1889 Ariz. Terr. Sess. Laws 16–17 (J.A. 209–

11).  The next year, Oklahoma similarly barred any person from carrying pistols and other firearms "into any church or religious assembly."  *See* Okla. Terr. Stat. ch. 25, art. 47, §§ 1, 2, 7 (1891) (J.A.214–16).

But, for the same reasons identified in *Bruen*, these restrictions provide little support for New York's place-of-worship restriction.  *See* 142 S. Ct. at 2154–56.  *First*, this Court should not "stake [its] interpretation on [two] temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population," and conflict with "'the overwhelming weight' of other, more contemporaneous historical evidence" regarding the right to carry firearms in public for self-defense.  *Id.* at 2154–55.

*Second*, "these territorial laws were rarely subject to judicial scrutiny," so "the basis for their perceived legality is unclear."  *Id.* at 2155.  That's particularly germane here because many state courts operated

under an understanding of the right to bear arms that was repudiated by *Heller*.[6] *See id.*

*Third*, many territorial laws were short-lived, so they "appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation." *Id.* at 2155. *Bruen* found these territorial statutes to be of little instructive value, and so should this Court.

**General Prohibitions.** New York's expert also pointed to several state, territorial, and local restrictions laws that broadly prohibited carrying firearms in public. Appellant's Br. 22. For example, he pointed to an 1869 law from Tennessee that prohibited firearms in any "public assembly of the people." *See id.* (quoting Ch. 22, 1869 Tenn. Pub. Acts 23, 23 (1st Sess.)). Similarly, he identified an 1889 territorial law from

---

[6] For example, one of the cases New York relies on (at 23) explained that individuals have no right to carry a firearm when they hold social gatherings in *their own homes* because "[s]uch places … are intended to be kept sacred and inviolate from the rights and claims which attach to the exercise of such acts of individual ownership under other circumstances." *Owens v. State*, 3 Tex. Ct. App. 404, 407 (1878) (explaining further that "[t]he fact that I am owner of the premises gives me no right to carry deadly weapons to the terror, annoyance, and danger of a social gathering which I may have invited to my own house"). *But see Heller*, 554 U.S. at 635 (holding that "the District's ban on handgun possession in the home violates the Second Amendment").

Idaho, as well as several laws from localities in Kansas and Utah, that broadly prohibited firearms from cities and towns altogether. *See id.* (citing J.A.156–59).

But these restrictions didn't target places of worship. Rather, these restrictions were simply so broad that they necessarily encompassed places of worship. For that reason, they provide even less insight on the Second Amendment's original meaning, at least as it relates to place-of-worship restrictions, than the late nineteenth-century state and territorial statutes that New York relies on.

This conclusion shouldn't surprise anyone—especially New York. After all, *Bruen* rejected a similar attempt from New York to define "sensitive places" as places where people typically congregate and where law-enforcement personnel are presumptively available, which it claimed would "effectively declare the island of Manhattan a 'sensitive place.'" *See* 142 S. Ct. at 2133–34. And that's precisely what the Tennessee law did, so it "operated under a fundamental misunderstanding of the right to bear arms," as expressed in *Heller* and *Bruen*. *See id.* at 2155.

Likewise, *Bruen*'s understanding of the Second Amendment's original meaning is inconsistent with the complete prohibitions in Idaho,

Kansas, and Utah, and, therefore, trumps them all. *See id.* at 2137 ("But to the extent later history contradicts what the text says, the text controls."); *see also Young v. Hawaii*, 896 F.3d 1044, 1057–58 (9th Cir. 2018) (explaining that "Heller knocks out the load-bearing bricks in the foundation" of cases holding that the Second Amendment was only a right to be exercised in connection with a militia).

**Judicial Precedent.** Each of the cases New York relies on to establish a historical tradition of regulating firearm possession in places of worship furnishes little instructive value. *See* Appellant's Br. 22–24. That's because they all understood the Second Amendment to secure, not an individual right, but a right only to be exercised in connection with the militia. *See, e.g., A*ndrews *v. State,* 50 Tenn. 165, 177–78 (1871) (holding a state law unconstitutional to the extent that it bars the public carry of a "soldier's weapon"); *English v. State*, 35 Tex. 473, 476 (1872)[7] ("The word 'arms' in the connection we find it in the Constitution of the United

---

[7] Even *English* appears to concede that the law under consideration "was an *innovation* upon the customs and habits of the people." *See* 35 Tex. at 479 (emphasis added). And it justified that "innovation" by arguing that "the latter half of the nineteenth century is not too soon for Christian and civilized States to legislate against any and every species of crime." *Id.* at 479–80.

States, refers to the arms of a militiaman or soldier, and the word is used in its military sense."); *Hill v. State*, 53 Ga. 472, 475 (1874) ("In what manner the right to keep and bear these pests of society [dirks, bowie knives, and more], can encourage or secure the existence of a militia, and especially of a well regulated militia, I am not able to d[i]vine."); *Wilson v. State*, 33 Ark. 557, 560 (1878) (explaining that "to prohibit the citizen from wearing or carrying a war arm … is an unwarranted restriction upon his constitutional right to keep and bear arms"). But *Heller* "made clear that the Second Amendment is, and always has been, an individual right centered on self-defense," so it "knocks out the load-bearing bricks in the foundation of [these] cases." *See Young*, 896 F.3d at 1057–58 (citing, among other cases, *Hill*, 53 Ga. at 475, and *English*, 35 Tex. at 477).

Not only did those cases rely on a militia-connected understanding of the right, but most of them also grounded their decisions in the distinct rights created under their analogous state constitutional provisions. *See Andrews*, 50 Tenn. at 177–78 (relying on the state constitutional provision granting citizens a right to keep and bear arms "for their common defense" and permitting legislative regulation of "the wearing of arms, with a view to prevent crime"); *English*, 35 Tex. at 478–79 (explaining

that the "[Texas] Constitution, however, confers upon the Legislature the power to regulate" the right to keep and bear arms); *Hill*, 53 Ga. at 479 (explaining that the state constitution expressly provides, as a qualification to the right to keep and bear arms, that 'the general assembly may prescribe the *manner* in which arms may be borne'"). The states' reliance on state, rather than federal, constitutional guarantees diminishes the instructive value of these cases.

### 3. Recent place-of-worship statutes cut against broad prohibitions like New York's.

The State Amici point to several late twentieth century place-of-worship restrictions as evidence of a "robust historical tradition of governments regulating the carry of firearms in places of worship." *See* States' Amicus Br. 8–9. Hardly. Those restrictions actually provide even less "insight into [the Second Amendment's] original meaning" than New York's late nineteenth century evidence. *See Bruen*, 142 S. Ct. at 2137 (explaining that such late-in-time evidence is only helpful as "confirmation of what the Court thought had already been established" (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). All of the place-of-worship restrictions that the State Amici identified were enacted within the last 32 years—some even within the last decade—so they

provide no insight into whether New York's place-of-worship restriction falls within the Second Amendment's scope.[8]

But even assuming that such laws could establish a longstanding tradition of similar firearms restrictions, these place-of-worship laws lend New York little support. Of the eleven state restrictions that the State Amici identified, only one—from Nebraska—imposes a place-of-worship restriction nearly as broad as New York's. States' Amicus Br. 8. Recall that New York makes it a "class E felony" to possess a firearm in "any place of worship or religious observation." N.Y. Penal Law §§ 265.01-e, (1), (2)(c). Similarly, in Nebraska, concealed carry permit-holders may not carry concealed handguns in "places of worship." Neb. Rev. Stat. § 69-2441(1)(a).

But the remaining ten restrictions—in nine states and the District of Columbia—permit concealed carry in places of worship, so long as the

---

[8] *See* H.B. 1273, 65th Legis. Assemb. (N.D. 2017); 62 D.C. Reg. 1944, 1945, 1949–61 (2015); S.B. 308, 150th Gen. Assemb., 2009-10 Reg. Sess. (Ga. 2009); Concealed Handgun Permit Act, L.B. 454, 99th Leg., 2d Reg. Sess. (Neb. 2006); H.B. 12, 125th Gen. Assemb., 2003-04 Reg. Sess. (Ohio 2003); H.B. 349, 92nd Gen. Assemb., 1st Reg. Sess. (Mo. 2003); H.B. 4530, 90th Leg., 2000 Reg. Sess. (Mich. 1999); S.B. 2, 1996 1st Extraordinary Sess. (La. 1996); H.B. 3730, 1996 Reg. Sess. (S.C. 1995); H.B. 1088, 8th Reg. Sess. (Ark. 1995); S.B. 2102, 1991 Reg. Sess. (Miss. 1991).

religious authority or governing body approves. *See* Ark. Code Ann. §§ 5-73-306(15), 5-73-322(g)–(h); D.C. Code § 7-2509.07(b)(2); Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1379.3(N); Mich. Comp. Laws Serv. § 28.425o(1)(e); Miss. Code Ann. §§ 45-9-101(13), 45-9-171(2)(a); Mo. Rev. Stat. § 571.107(1)(14); N.D. Cent. Code § 62.1-02-05(1)(b), (2)(m); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 23-31-215(M)(8); *see also* States' Amicus Br. 8 (conceding that these restrictions permit concealed carry whenever the relevant religious authority approves).[9] Far from imposing a "comparable burden on the right of armed self-defense," *Bruen*, 142 S. Ct. at 2133, these sensitive place restrictions all impose a lighter burden on permitholders' rights than New York's restriction or the late nineteenth-century regulations it identified. For that reason, these laws fail to provide the "well-established and representative historical *analogue*" necessary for *Bruen*'s analogical inquiry. *See id.* at 2133.

---

[9] Georgia, Louisiana, South Carolina, and Mississippi all initially imposed broad place-of-worship restrictions. *See* S.B. 308, 150th Gen. Assemb., 2009-10 Reg. Sess. (Ga. 2009); S.B. 2, 1996 1st Extraordinary Sess. (La. 1996); H.B. 3730, 1996 Reg. Sess. (S.C. 1995); S.B. 2102, 1991 Reg. Sess. (Miss. 1991). But each of these states amended their laws to permit permitholders to carry if the relevant religious authority approved. *See* H.B. 308, 152nd Gen. Assemb., 2013-14 Reg. Sess. (Ga. 2013); H.B. 1272, 2010 Reg. Legis. Sess. (La. 2010); S.B. 1261, 116th Sess., Gen. Assemb. (S.C. 2005); H.B. 786, 2016 Reg. Sess. (Miss. 2016).

## CONCLUSION

As *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. Rather, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35 (emphasis in original)). So, evidence closer in time to the Second Amendment's adoption is most relevant for understanding the Amendment's scope. Of course, evidence of historical regulations through the end of the nineteenth (or even twentieth) century *could* be relevant, but only to the extent that it confirms what prior evidence "already … established." *Id.* at 2137 (quoting *Gamble*, 139 S. Ct. at 1976). Otherwise, *Gamble* clarified that *Heller*'s interest in mid- to late-19th-century commentary was secondary." *Id.*; *Gamble*, 139 S. Ct. at 1975–76 (*Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading").

The Second Amendment protects the right to possess handguns, both in the home and in public, for the purpose of self-defense. *McDonald v. City of Chi.*, 561 U.S. 742, 767 (2010); *Bruen*, 142 S. Ct. 2121. And New York fails to identify a single similar or analogous place-of-worship

restriction before 1870. So, on this record, when the first analogous place-of-restriction surfaced in 1870, there was no historical traditional *at all* of such regulations. Sweeping aside the irrelevant evidence New York offers, including the territorial statutes, local ordinances, and judicial precedent, *see supra* Sect.I.A.2, it only identified four statutes—enacted between 1870 and 1877—that arguably support its restriction here. But "[t]hat is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry," including in places of worship. *See Bruen*, 142 S. Ct. at 2149. This Court should affirm.

DATED this 6th day of March, 2023.

AUSTIN KNUDSEN
  *Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
peter.torstensen@mt.gov

*Attorneys for Amicus Curiae*
*State of Montana*

21

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TIM GRIFFIN
*Attorney General of
Arkansas*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

JOHN M. FORMELLA
*Attorney General of
New Hampshire*

GENTNER F. DRUMMOND
*Attorney General of
Oklahoma*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

KEN PAXTON
*Attorney General of
Texas*

PATRICK MORRISEY
*Attorney General of
West Virginia*

BRIDGET HILL
*Attorney General of
Wyoming*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Montana Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,330 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Local Rules 29.1(c) and 32.1(a)(4).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.