IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | 2:24-CV-86-Z |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for Stay of Agency Action and Preliminary Injunction ("Motion") (ECF No. 16), filed May 14, 2024. Based on the reasons discussed *infra*, it is **GRANTED IN PART**. Pending final resolution of this case, Defendants are hereby **ENJOINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"), which is scheduled to take effect on August 1, 2024. This preliminary injunction is limited to Plaintiffs Daniel A. Bonevac, John Hatfield, and the State of Texas.

SUMMARY

The Final Rule inverts the text, history, and tradition of Title IX: the statute protects women in spaces historically reserved to men; the Final Rule inserts men into spaces reserved to women. Defendants invoke *Bostock v. Clayton County*, 590 U.S. 644 (2020) to rationalize the Final Rule's inversion of the statutory text but do not adequately explain why that Title VII employment case controls this Title IX education case, which instead implicates *women*'s athletics, safety, and sex-specific facilities in a different setting: schools, colleges, and universities.

BACKGROUND

## I. Title IX promotes opportunities for women.[1]

Title IX of the Education Amendments, enacted in 1972, forbids education programs or activities receiving federal financial assistance from discriminating "on the basis of sex." 20 U.S.C. § 1681(a). Before its enactment, nearly thirty-four percent of working women lacked high school diplomas and only seven percent of high school varsity athletes were women. Roughly fifty years later, only six percent of working women lack high school diplomas and forty-three percent of high school varsity athletes are women.[2] In short, Title IX is succeeding: women and girls across America now benefit from opportunities to pursue advanced education, attend college, and develop athletic skills.

That is because Title IX recognizes the "enduring" differences "between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996). For example, Title IX exempts traditional single-sex institutions and programs like "fraternities or sororities"; "Boy or Girl conferences"; "Father-son or mother-daughter activities"; and "'beauty' pageants" from its requirements. 20 U.S.C. § 1681(a)(6)–(9). Congress, in other words, peppered Title IX with explicit references to the biological and binary categories of two sexes with repeated references to "one sex" and "both sexes." 118 CONG. REC. 5,807 (1972) (Sen. Bayh). As such, it does not "require[] integration of dormitories between the sexes" or mandate co-ed locker rooms or football teams. 117 CONG. REC. 30,407 (1971) (Sen. Bayh).[3]

---

[1] *I.e.*, biological women. *See Bostock*, 590 U.S. at 655 ("[F]or argument's sake, we proceed on the assumption that 'sex' signifie[s] . . . only . . . biological distinctions between male and female.").

[2] U.S. Bureau of Labor Statistics, TED, https://perma.cc/EH4F-2CYD; 50 Years of Title IX, WSF (May 2022), https://perma.cc/TN72-PJ4S.

[3] Here, legislative history is evidence of contemporaneous public meaning — not a search for legislative "intent." *Cf.* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 394 (2012).

The first Title IX regulations further codified the "enduring" differences between men and women. In 1975, the Department of Education's ("Department" or "government") predecessor promulgated regulations that "required" a school "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (codified at 34 C.F.R. § 106.41(c)(1)). Texas recipients relied on this understanding for fifty years, investing billions of dollars to extend equal educational and athletic opportunities to women.

**II.  The Final Rule relies on untenable readings of Title IX.**

The Department now upends a half-century of reliance interests through its newest regulation, Nondiscrimination on the Basis of Sex, 89 Fed. Reg. 33,474 (Apr. 29, 2024).

First, the Final Rule reads sexual orientation and gender identity into Title IX's anti-discrimination principle in violation of that statute and the Administrative Procedure Act ("APA"). It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 33,886 (to be codified at 34 C.F.R. § 106.10). The Department explains that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655). The Final Rule also understands "sex discrimination" to be "any discrimination that depends" even "in part on consideration of a person's sex." *Id.* at 33,803.

Now, Texas recipients cannot employ sex-based distinctions to deny "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity."

3

*Id.* at 33,818. And any policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity" causes more than *de minimis* harm and is prohibited absent a statutory or regulatory exception. 89 Fed. Reg. at 33,818.

Second, the Final Rule imposes a "hostile environment harassment" rule that will likely chill student and professor speech on recipient campuses. Said harassment covers:

> [u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity . . . . Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of [five separate factors].

89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2). The "subjective[]," ambiguous, and "fact-specific" nature of these inquiries likely chill campus speech.

Third, the Final Rule requires Plaintiffs to cover abortions in their student health insurance plans. The Final Rule specifically requires Texas recipients to:

> treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.

89 Fed. Reg. at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(4)); *see* 89 Fed. Reg. at 33,883 (to be codified at 34 C.F.R. § 106.2) ("pregnancy or related conditions" include "termination of pregnancy"). This regulation implicates Texas's sovereign interests in enforcing its duly enacted laws, which prohibit exactly this conduct. *See* TEX. HEALTH & SAFETY CODE § 171.208(a)(2) (imposing civil liability on anyone who "knowingly engages in conduct that *aids or abets* the performance of inducement of an abortion, *including paying for or reimbursing the costs of an abortion through insurance or otherwise* . . . .") (emphasis added).

Fourth, the Final Rule eviscerates procedural safeguards for the Title IX grievance process. In sum and substance, it requires the use of a single-investigator model (34 C.F.R. § 106.45(b)(2)); barriers to the accused for accessing relevant evidence (34 C.F.R. § 106.45(f)(4)(i)); and unfair limits on live hearing procedures for postsecondary institutions (34 C.F.R. § 106.46(g)).

### III.  Texas must either comply or adopt policies violating State law.

The State of Texas "administers numerous education programs and operates thousands of educational institutions through its constituent agencies and political subdivisions, including programs and institutions that receive federal funding and are subject to Title IX and its effectuating regulations." ECF No. 16 at 48. The Texas Education Agency ("TEA") manages some education programs directly, like the Texas School for the Deaf, whose dormitories, athletic teams, and locker rooms are separated by biological sex. ECF No. 16-1 at 7. Others it manages indirectly, like Texas's six public university systems which "invested an entire infrastructure to implement its education systems" on the basis of sex-based distinctions. ECF No. 16 at 51.

Indeed, Texas law protects sex separation in K–12 and higher education athletic programs. *See* TEX. EDUC. CODE § 33.0834 ("[A]n interscholastic athletic competition team sponsored or authorized by a school district or open-enrollment charter school may not allow . . . a student to compete in an interscholastic athletic competition . . . that is designated for the biological sex opposite to the student's biological sex."). Political subdivisions extend this biological-sex mandate into intimate facilities. For example, the Carroll, Frisco, and Grapevine–Colleyville Independent School Districts require schools owned or operated by the districts to separate bathrooms, locker rooms, shower rooms, and other similar facilities based on biological sex (1) determined at birth and (2) correctly identified on a person's birth certificate. ECF No.

16-1 at 21, 23, 30. Other school districts prohibit district employees from applying pronouns inconsistent with the student's biological sex. *Id.* at 22, 24–29

Under Texas law, the TEA oversees Title IX compliance within the State. ECF No. 16 at 49. "As part of its mandate, TEA allocates the majority of federal funding for Texas K–12 education." *Id.* Texas received nearly $6.6 billion in federal funding for K–12 education for 2021–2022.[4] For fiscal year 2023, the TEA distributed roughly $9.4 billion in federal funding and an additional $4.8 billion in federal disbursements. ECF No. 16-1 at 4.

In summary, the State of Texas and its political subdivisions are on a collision course with the Final Rule. Texas can either (1) comply and violate State law, local policy, and many of its employees' rights of conscience or (2) reject the Final Rule and lose billions in federal funding for its K–12 and higher-education systems.

## LEGAL STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits[.]" *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Plaintiffs must demonstrate (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S.

---

[4] Tex. Educ. Agency, 2022 *Comprehensive Biennial Report on Texas Public Schools* at 239 (Dec. 2020), https://tea.texas.gov/reports-and-data/school-performance/accountability-research/comp-annual-biennial-2022.pdf.

418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th

563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the

intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny a preliminary

injunction lies within the sound discretion of the trial court[.]" *White v. Carlucci*, 862 F.2d

1209, 1211 (5th Cir. 1989).

ANALYSIS

**I.  Plaintiffs are substantially likely to prevail on the merits.**

The likelihood of success on the merits "is arguably the most important" factor for

preliminary relief. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th  220, 233

(5th Cir. 2024) (citations omitted); *accord Mock*, 75 F.4th at 587 n.60. Here, Plaintiffs argue that

the Final Rule (1) violates Title IX's prohibition against "sex" discrimination; (2) illegally

redefines "sex-based harassment"; (3) illegally protects abortion; and (4) illegally changes

procedural safeguards in the Title IX grievance process, thereby violating Title IX, the APA, and

the Constitution.

The APA generally requires courts to "hold unlawful and set aside agency action" that is

"arbitrary and capricious, an abuse of discretion, . . . otherwise not in accordance with law," or

"in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C.

§§ 706(2)(A), (C). This standard of review requires courts to assess only whether the Final Rule

was "based on a consideration of the relevant factors and whether there has been a clear error of

judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Those

factors include when an agency (1) has relied on factors Congress has not intended it to consider;

(2) entirely failed to consider an important aspect of the regulatory problem; (3) justified its

conduct counter to the evidence before it; or (4) reached a determination that "is so implausible .

. . it could not be ascribed to a difference in view or . . . agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Once a court determines that the contested agency action falls short of the APA's substantive or procedural requirements, it "shall" set aside the unlawful agency action. 5 U.S.C. § 706(2); *Data Mktg. P'ship, L.P. v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).

### A.  The anti-discrimination regulation violates Title IX and the APA.

The Final Rule interprets Title IX to provide that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). The Department explains that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655). Further, the Final Rule understands "sex discrimination" to be "any discrimination that depends" even "in part on consideration of a person's sex." 89 Fed. Reg. at 33,803.

### 1.  Title VII does not govern Title IX.

The government interprets Title IX in light of *Bostock* — a Title VII case. ECF No. 41 at 17–24. That comparison begs the question whether Title VII caselaw governs Title IX. The government claims that "[t]he Supreme Court has long used the phrase 'on the basis of' [in Title IX] interchangeably with Title VII's 'because of' language when discussing Title VII's causation standard, including in *Bostock* itself." ECF No. 41 at 18 (citing *Bostock*, 590 U.S. at 650; *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007); *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992);

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 248 (5th Cir. 1997); *Lakoski v. James*, 66 F.3d 751, 756 & n.3 (5th Cir. 1995); *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337 (5th Cir. 2019) (Ho, J., concurring)).

However, *Bostock*'s but-for causation standard dramatically altered Title VII. *See Bostock*, 590 U.S. at 688 (Alito, J., dissenting) ("The arrogance of [the majority's] argument is breathtaking."). Hence, it does not follow that these pre-*Bostock* cases would have made the same comparison today.

The government cites the opening line of one post-*Bostock* case to support its reading of Title IX. ECF No. 41 at 22–23 (citing *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023)). That case provides that *Bostock* "determined that Title VII of the Civil Rights Act of 1964 forbids employers from discriminating against homosexuals and transgender persons, holding that such discrimination is 'on the basis of sex.'" *EEOC*, 70 F.4th at 918. But *EEOC* does not support the government's reading here. First, the foregoing statement is dicta and not relevant to the Court's holding. Second, *EEOC* misstated *Bostock*'s holding, which interpreted "because of . . . sex" under Title VII. Third, *EEOC* was not a Title IX case. *EEOC*, in other words, offers no guidance for this Court's reading of Title IX.

## 2. *Bostock*'s "but-for" causation does not apply to Title IX.

Instead of pre-*Bostock* cases, "[w]e [should] start where we always do: with the text of the statute." *Career Colleges*, 98 F.4th at 240 (quoting *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023)); *accord* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–92 (2012). Essential to the Court's "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

That requires, *inter alia*, reading the statute in context and "not in isolation." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). "Other sources . . . include contemporaneous dictionaries, related statutes, and past statements of the Department." *Career Colleges*, 98 F.4th at 240.

Title IX's general provision on "sex" provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

The government argues that the foregoing text demands consideration of gender identity and sexual orientation. ECF No. 41 at 18. Section 1681(a) is so clear, it says, that courts need not look beyond the text to statutory context or ordinary public meaning. *See Bostock*, 590 U.S. at 593 (because "the express terms of [Title VII] give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is law, and all persons are entitled to its benefit"); *see also* ECF No. 41 at 24 ("The Final Rule explains the application of *Bostock*'s reasoning in detail . . . ."); 89 Fed. Reg. at 33,805 ("The Department's interpretation of Title IX flows from the statute's 'plain terms' . . . .").

*Bostock* concluded that Title VII's prohibition of sex discrimination "because of . . . sex" covers discrimination based on gender identity and sexual orientation. *Bostock*, 590 U.S. at 660. Because "sex is necessarily a but-for cause" of transgender discrimination, "it is impossible" to discriminate against transgender individuals "without discriminating against that individual based on sex." *Id.* at 660, 661. For example, if an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as

female at birth." *Id.* at 660. So "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.*

The foregoing argument "is wrong" in the Title IX context. *Id.* at 689 (Alito, J., dissenting); *see L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 420 (6th Cir. 2023) (explaining that *Bostock*'s "reasoning applies only to Title VII, as *Bostock* itself and . . . subsequent cases make clear"). It does not follow that because sexual orientation and gender identity are related to biological sex that discrimination "because of" the former amounts to discrimination "on the basis of" the latter. But that is exactly what the Final Rule assumes.

However, neither sexual orientation nor gender identity are logical predicates to discrimination "on the basis" of biological sex. "[I]t is quite possible," for example, for a Title IX school "to discriminate on those grounds without taking the sex of an individual [student] into account." *Id.* at 690. It can have a policy that states: "No transgender students of either sex may participate on athletic teams of the opposite sex." This policy discriminates, but not "on the basis of sex," because it governs transgender students of *either* sex. Gender identity is the dispositive factor — not biological sex. *See id.* (A school "can implement this policy without paying any attention to or even knowing the biological sex of gay, lesbian, and transgender" students.).

This is fatal to the Final Rule. "[I]f a [Title IX school] discriminates against individual [students] without even knowing whether they are male or female, it is impossible to argue that the [school] intentionally discriminated because of sex." *Id.* at 691. That is because a Title IX school cannot "intentionally discriminate on the basis of a characteristic of which [the school] has no knowledge." *Id.* And if that is true, sex discrimination does not reduce to gender-identity discrimination simply because a school might know the individual student's sex. Sex is not the dispositive factor — gender identity is.

Fair enough that "[m]any things are related to sex." *Id.* at 694. But what matters for purposes of Title IX is whether it prohibits discrimination because of *biological sex itself* — "not everything that is related to, based on, or defined with reference to, 'sex.'" *Id.* Of course, textualism considers not only the language itself, but also the statutory context and original public meaning. *See Wis. Cent. Ltd.*, 585 U.S. at 277 (explaining that the Court's essential "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute"). But to the extent that the Court divorces the text from these relevant considerations, *Bostock*'s but-for causation reading of Title VII fails on its own terms in the Title IX context.

### 3. Title IX does not address gender identity or sexual orientation.

Proper textualism — accounting for ordinary public meaning and statutory context — illustrates the chasm between Title IX and the Final Rule. Consider the words themselves. The term "sex," as of 1972, bore no logical relationship to notions of "gender identity." At that time, "sex" meant only a person's biological sex — male or female — which "is an immutable characteristic determined solely" at "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality op.). And "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment" reinforce what the public understood in 1973: "when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., [sic] discrimination between males and females." *Adams by & through Kasper Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc); *see Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic

12

segregation and recombination which underlie most evolutionary change . . . .").[5]

The text, after a court analyzes its individual words, should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). That is because "context always includes evident purpose," SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63, especially when Title IX itself identifies purposes inherent to the statute, 20 U.S.C. § 1682 (explaining that federal agencies must issue rules, regulations, or orders "consistent with achievement of the *objectives of the statute* . . . .") (emphasis added); *see also* James C. Phillips, *The Overlooked Evidence In the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript); *see also Bostock*, 590 U.S. at 709 n.22 (Alito, J., dissenting) (citing Phillips, *supra*).

Statutory context illustrates Title IX's overarching objectives: to prevent discrimination against women in public and higher education. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) ("Congress enacted Title IX in 1972 with two principal objectives in mind: 'to avoid the use of federal resources to support discriminatory practices' and 'to provide individual citizens effective protection against those practices.'") (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)); *see also Neese v. Becerra*, 640 F. Supp. 3d 668, 681–82 (N.D. Tex. 2022) ("Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities.") (quoting *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004)); 118 CONG. REC. 5,804 (1972) (Sen. Bayh)

---

[5] *See also Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The propriety of quality by which organisms are classified according to their reproductive functions."); *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these.").

(noting that the hearings included "[o]ver 1,200 pages of testimony document[ing] the massive, persistent patterns of discrimination against women in the academic world").

For example, while Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), it authorizes numerous carve-outs for sex-specific organizations, events, and spaces. *See id.* §§ 1681(a)(6) (excepting "a social fraternity or social sorority," "the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls . . . the membership of which has traditionally been limited to persons of one sex and principally to persons less than nineteen years of age"), (7)(B)(i) (excepting "any Boys State conference, Boys Nation conference, or Girls Nation conference"), (8) (excepting "[f]ather–son or mother–daughter activities at educational institutions," explaining that "if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of the *other sex*") (emphasis added), (9) (excepting "'beauty' pageants . . . in which participation is limited to individuals of one sex only"); *see also id.* § 1686 ("nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes"). In summary, the statute expressly protects female-specific spaces and opportunities in education.[6]

### 4. The Final Rule is arbitrary and capricious.

Once a court determines the contested agency action falls short of the APA's substantive or procedural requirements, it "shall" set aside the unlawful agency action. 5 U.S.C. § 706. Here, the Final Rule violates Section 706(2) because the government misapplied Title VII to

---

[6] Neither the Final Rule nor the parties address these statutory "exceptions," but the Department's reading would likely produce a statutorily absurd result that violates several canons: Sections 1681(a)(6), (7)(B)(i), (8), and (9) expressly allow a women-centric sorority or pageant to *exclude* men while the Final Rule for Section 1681(a) requires such organizations to *include* men – *if* they identify as women. *See, e.g.*, SCALIA & GARNER, *supra* note 3, at 63–65 ("Presumption Against Ineffectiveness"), 69-77 ("Ordinary Meaning"); 78–92 ("Fixed Meaning"), 174–79 ("Surplusage"), 180–88 ("Harmonious Reading").

misread Title IX. *See* 89 Fed. Reg. at 33,801–11 (explaining the Final Rule's reliance on *Bostock*). Whatever can be said about Title VII, Title IX is different. First, the statutes use different words; regardless of how courts used to conflate them, *Bostock* unsettled those long-held assumptions. Second, courts predicated those long-held assumptions on the ordinary public meaning of both Title VII and Title IX. *See Bostock*, 590 U.S. at 704–720 (Alito, J., dissenting) (discussing the ordinary public meaning of Title VII). And the ordinary public meaning of both statutes *never* grouped sexual orientation or gender identity under the concept of sex-based discrimination. Third, and perhaps most importantly, Title IX's function was — and is — to provide equality for women in education. *See* 20 U.S.C. § 1682 (mandating agencies to promulgate rules "consistent with achievement of the objectives of [Title IX] . . . ."); *see also* Phillips, *supra* at 3 ("And read as a composite, the phrase had more semantic content than one could glean from separately analyzing and then amalgamating its three parts ('discriminate,' 'against,' and 'sex').").

Title IX protects women in spaces that were historically reserved to men. In stark contrast, the Final Rule inserts men into the very Title IX spaces statutorily reserved to women. Consequently, Title IX differs from Title VII in both the forest and the trees under every granular and capacious canon of statutory construction. The Final Rule, in other words, attempts exactly the kind of interpretation that "is so implausible . . . it could not be ascribed to a difference in view or . . . agency expertise." *State Farm*, 463 U.S. at 43. The Court therefore **FINDS** that it is arbitrary and capricious.

### B.  The sex-based harassment rules likely violate the First Amendment.

Title IX provides that no person "on the basis of sex" may be "subjected to discrimination." 20 U.S.C. § 1681(a). The Final Rule imposes new regulations stating that "[s]ex-based harassment . . . is a form of sex discrimination and means sexual harassment and other

15

harassment on the basis of sex . . . ." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2).

Under this scheme, "hostile environment harassment" covers the following:

> [u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity . . . Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of [five separate factors].

*Id.* Plaintiffs argue that the foregoing regulations violate the First Amendment.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. CONST. amend. I. It specifically forbids chilled speech. *See United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (clarifying that "[o]verbroad laws 'may deter or "chill" constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas'") (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003)). And "[n]arrow tailoring is crucial where First Amendment activity is chilled — even if indirectly — '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

Plaintiffs are correct. The Department did not narrowly tailor the Final Rule and therefore chilled Plaintiffs' speech. *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (identifying a regulation as impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement") (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). For instance, the Department equivocates on whether "misgendering" fits within its "hostile environment harassment" scheme. While "[m]any commentators . . . believe that misgendering is one form of sex-based harassment," the Final Rule is less clear. 89 Fed. Reg. at

16

33,516. It provides that "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific." *Id.* And Title IX coordinators must afford credence to an individual claimant's "subjective" sense of "offensive[ness]." *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2).

Plaintiffs are apprehensive about the reach of sex-based harassment under the Final Rule. Daniel A. Bonevac, a philosophy professor at the University of Texas at Austin, assumes that he should use subjective gender terms to avoid discipline under the Final Rule. *See* ECF No. 16-1 at 14 (assuming he should use the singular pronoun "they" and other "'made-up' pronouns"). In short: Texas recipients, students, and employees (like Plaintiffs) do not know, based on the Final Rule, whether misgendering constitutes "hostile environment harassment."

Defendants do not contest that "misgendering" language is otherwise protected speech under the First Amendment. *Cf. Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571–72 (1942) (explaining that there are "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem"). The Court therefore **FINDS** that the Final Rule's harassment regulations likely chill Plaintiffs' First Amendment speech.

### C.  The Final Rule wrongfully requires Texas insurers to cover abortions.

Plaintiffs argue that the Final Rule wrongfully requires them to violate Texas abortion laws. ECF No. 16 at 36–38. Title IX's "Neutrality with respect to abortion" provision states:

> Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion.
>
> Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion.

20 U.S.C. § 1688.

The Department regulations implemented in 1975 prohibit discrimination on the basis of "termination of pregnancy." *Compare* 40 Fed. Reg. 24,128 (codified at 45 C.F.R. § 86.21(c)(2)) (prohibiting discrimination in admissions based on "termination of pregnancy or recovery therefrom"), 86.57(b) ("A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of . . . termination of pregnancy, or recovery therefrom.") (1975) *with* 34 C.F.R. §§ 106.21(c) (prohibiting discrimination in admissions based on "termination of pregnancy, or recovery therefrom"), 106.40(b)(1) (prohibiting a recipient from discriminating "against any student, or exclud[ing] any student from its education program or activity" based on "termination of pregnancy, or recovery therefrom"), 106.57(b) (recipients may not discriminate against or exclude a person from employment based on "termination of pregnancy, or recovery therefrom") (current).

Defendants are correct that the foregoing provisions do not conflict with Title IX. *See* ECF No. 41 at 32 ("At most, the Rule [referring to the above] merely confirms these longstanding protections . . . ."). Taken together, they ensure equal admissions and employment opportunities for women who have terminated their pregnancies. But Plaintiffs take no issue with these provisions. Instead, Plaintiffs argue that "the Final Rule requires all healthcare plans offered by every educational institution to cover abortion on the same terms as 'any other temporary medical condition.'" ECF No. 16 at 37.

The Final Rule defines "pregnancy or related conditions" to include "termination of pregnancy," 89 Fed. Reg. at 33,883 (to be codified at 34 C.F.R. § 106.2), requiring recipients to:

> treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions *with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in* with respect to students admitted to the recipient's education program or activity.

18

*Id.* at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(4)) (emphasis added). Because "termination of pregnancy" is a "pregnancy or related condition" that recipient plans now must cover, the Final Rule requires Texas recipients to cover abortions for students who enroll in their medical plans.

Meanwhile, Texas law regulates and prohibits abortion. *See* TEX. HEALTH & SAFETY CODE § 170A.002(a) ("A person may not knowingly perform, induce, or attempt an abortion."); *see also id.* § 171.208(2) (subjecting to civil liability anyone who "knowingly engages in conduct that aids or abets the performance of inducement of an abortion, including paying for or reimbursing the costs of an abortion through insurance or otherwise"). Texas imposes both criminal and civil penalties for violations of this law. *Id.* §§ 170A.004–.005; *id.* § 171.208(2); TEX. PENAL CODE §§ 12.32–.33.

Defendants respond that (1) the Final Rule does not require Texas recipients to cover abortions through health insurance and (2) Plaintiffs lack standing to challenge the Final Rule anyways.

### 1.  The Final Rule requires recipient insurers to cover abortion.

First, the Final Rule plainly requires Texas recipients to cover abortion through their student health insurance plans. Defendants cite the Final Rule, which states that "nothing in Title IX or these final regulations requires recipients to pay for abortions either directly or through health insurance." 89 Fed. Reg. at 33,761 (citing 20 U.S.C. § 1688) (prohibiting any Title IX construction that "require[s] or prohibit[s] any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion"). The Department asserts that any contrary reading is "mistaken." 89 Fed. Reg. at 33,760. Not so.

The Department's contradictory statements cannot both be true. On the one hand, it explicitly requires Texas recipients to cover abortions in their student health insurance plans.

89 Fed. Reg. at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(4)). On the other, it disclaims this provision and states that it would violate Title IX. 89 Fed. Reg. at 33,760–61. The latter disclaimer is of little comfort when the Final Rule requires Texas recipients to cover abortions.

In essence, the Department admits that its own provisions violate Title IX and contradict the Final Rule. *Id.* Thus, the Final Rule's abortion protections are arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (labeling arbitrary and capricious a regulation that "is so implausible . . . it could not be ascribed to a difference in view or . . . agency expertise").

### 2.  Plaintiffs have standing to challenge the abortion regulations.

Second, Defendants argue that a Texas student seeking medical coverage for an abortion "relies on a highly attenuated chain of possibilities," ECF No. 41 at 34 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), including the assumption "that individuals will engage in illegal conduct," ECF No. 41 at 34 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)). As such, they conclude that Plaintiffs lack standing to challenge the termination-of-pregnancy regulations.

To establish standing, a plaintiff must show that it has suffered or will imminently suffer an "injury in fact" that was "caused" by the challenged government action that a favorable decision would likely "redress." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–62 (1992). To satisfy the injury-in-fact requirement, a plaintiff must allege an invasion of a "legally protected interest" that is "concrete," "particularized," and "actual or imminent." *Id.* at 560 (citations omitted). "[S]tanding is not dispensed in gross." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal marks omitted).

The Final Rule expressly requires Texas recipients to cover abortions in their student health insurance plans, 89 Fed. Reg. at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(4)), but Texas law prohibits that exact conduct. Under the Health and Safety Code, the following are subject to civil liability:

> [anyone who] knowingly engages in conduct that *aids or abets* the performance of inducement of an abortion, *including paying for or reimbursing the costs of an abortion through insurance or otherwise*, if the abortion is performed or induced in violation of this subchapter, regardless of whether the person knew or should have known that the abortion would be performed or induced in violation of this subchapter.

TEX. HEALTH & SAFETY CODE § 171.208(a)(2) (emphasis added); *see id.* § 245.002 (defining "abortion"). Thus, any Texas recipient who complies with the Final Rule must violate Texas law.

That violation infringes upon Texas's sovereign interest in enforcing its duly enacted laws. *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) (describing this power as "[p]aramount among the States' retained sovereign powers"). States may have standing "based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law . . . ." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

Each condition obtains here: Texas law subjects insurance providers to civil liability for abortion coverage and the Final Rule requires Texas recipients to subject themselves to this liability. These conditions create an obvious conflict between the enforcement of federal and state law. *See* 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.8) (declaring that the Final Rule preempts state law). Based on Plaintiffs' standing and the foregoing analysis, the Court **FINDS** that these regulations are arbitrary and capricious.

21

### D.  Some grievance procedures are arbitrary and capricious.

Plaintiffs challenge the Final Rule's update in procedural safeguards for the Title IX grievance process. ECF No. 16 at 39–47. They specifically challenge provisions concerning use of a single-investigator model (34 C.F.R. § 106.45(b)(2)); initiation of a complaint by the Title IX Coordinator (34 C.F.R. § 106.44(f)(1)(v)); the manner in which a recipient may allow parties to a complaint to access the relevant evidence (34 C.F.R. § 106.45(f)(4)(i)); live hearing procedures for postsecondary institutions (34 C.F.R. § 106.46(g)); and the recipient's options for the standard of proof to be applied in proceedings (34 C.F.R. § 106.45(h)(1)). Defendants respond (1) that Plaintiffs lack standing to challenge the grievance procedures and (2) that the Final Rule's changes are not arbitrary and capricious. ECF No. 41 at 42–52.

### 1.  Plaintiffs have standing to challenge the grievance procedures.

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis*, 554 U.S. at 734 (internal marks omitted). Here, the government argues that the State of Texas lacks standing because individual schools can *choose* to implement policies the State deems acceptable. ECF No. 41 at 44.

This mischaracterizes Texas's standing injury. Properly understood, "[i]f recipients comply with the Department's new regulations, they risk civil rights lawsuits and litigation expenses." ECF No. 16 at 41. But "[i]f they side with the constitutional rights of their students and employees, they invite federal or private enforcement actions, jeopardizing not only their reputation but their access to federal funds." *Id.*

The government responds that Texas impermissibly speculates about potential future lawsuits. ECF No. 41 at 45 (citing *Sullo & Bobbitt P.L.L.C. v. Abbott*, 536 F. App'x 473, 477 (5th Cir. 2013) (unpublished) (stating that a plaintiff's alleged injury of being "subject to potential

22

lawsuits with minimal chances of success" is "not certainly impending")). But little speculation is necessary when prior Department initiatives with similar incentives "resulted in a record number of lawsuits and judgments against public universities . . . ." ECF No. 16 at 42 (citing Jonathan Taylor, *Milestone: 700+ Title IX/Due Process Lawsuits by Accused Students*, Title IX for All (May 11, 2021), https://titleixforall.com/milestone-700-title-ix-due-process-lawsuits-by-accused-students/); *see also* Brian A. Pappas, *Procedural Convergence*, 55 LAW & SOC'Y REV. 381, 391 (2021) (concluding that "[u]niversities faced a choice of what constituted the larger risk: OCR enforcement or civil lawsuits?").

### 2. Some grievance procedures are arbitrary and capricious.

The Department's changes must be "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. Because the "new policy rests on factual findings that contradict those which underlay its prior policy," the Department must "provide a more detailed justification." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009).

#### a. Single-Investigator Model

Accused students at public institutions "must, at a minimum, receive protections consistent with the Due Process Clause of the Fourteenth Amendment." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) (citing *Goss v. Lopez*, 419 U.S. 565, 574–85 (1975)). For the first time, the Department provided "schools the option of using a single-investigator model." ECF No. 41 at 46 (citing 89 Fed. Reg. at 33,660–64). The Department explains that "requiring separate staff members to handle investigations and adjudication is burdensome for some recipients in a way that undermines their ability to ensure their education programs or activities are free from sex discrimination under Title IX." 89 Fed. Reg. at 33,662. And "permitting, but not requiring, the single-investigator model . . . in conjunction with the other

23

measures designed to ensure equitable treatment of the parties . . . offer[s] recipients reasonable options to structure their grievance procedures in compliance with Title IX . . . ." *Id.*

The Court is not persuaded. Other courts have already explained that the "dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious." *Brandeis*, 177 F. Supp. 3d at 606. Not to the Department, apparently. But "[n]o matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions." *Id.* Indeed, vesting one individual with such power in criminal proceedings violates due process. *See In re Oliver*, 333 U.S. 257, 278–79 (1948) (Rutledge, J., concurring) (noting that a one-man grand jury "takes away the security against being twice put in jeopardy for the same offense and denies the equal protection of the laws by leaving to the committing functionary's sole discretion the scope and contents of the record on appeal").

It does not matter that each recipient is "permit[ed], but not require[ed]" to adopt the single-investigator model. 89 Fed. Reg. at 33,662. That is because the single-investigator model itself lacks justification and therefore cannot be considered a product of reasoned decisionmaking. *State Farm*, 463 U.S. at 52; *Fox*, 556 U.S. at 515. Permitting — not requiring — the model is the problem that the Department has failed to justify.

### b. *Access to Evidence*

The Final Rule provides: "A recipient must provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or an accurate description of this evidence." 89 Fed. Reg. at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(4)(i)). In the latter case, a school "must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon request of any party." *Id.*; *see id.* at 33,682

24

(to be codified at 34 C.F.R. § 106.45(c)(1)(iv)) (notice of the right).

Thus, a student accused of a Title IX violation might face circumstances where he can access only an "accurate description" of the evidence against him. The Department justifies this change because "the description option may be more appropriate for complaints involving younger students and individuals facing less severe consequences, allowing the recipient to streamline the investigation process while ensuring that the parties have a meaningful opportunity to be heard." *Id.* at 33,695. The Final Rule notably does not explain what constitutes "less severe consequences." Individual recipients presumably make this *ad hoc* determination.

"When a right is protected by the Due Process Clause, a state 'may not withdraw [it] on the grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct occurred." *Doe v. Purdue University*, 928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.) (quoting *Goss*, 419 U.S. at 574). In *Doe*, then-Judge Barrett held that Purdue University violated a student's due process rights when it "did not disclose its evidence" to him. *Doe*, 928 F.3d at 663. She explained that "withholding the evidence on which it relied in adjudicating [the student's] guilt was itself sufficient to render the process fundamentally unfair." *Id.* (quoting *Goss*, 419 U.S. at 580 (stating that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights")).

The Final Rule is too ambiguous and discretionary to satisfy due process. First, it allows individual recipients to choose whether a student can access the evidence or only an accurate description. Second, individual recipients get to decide what's "relevant" evidence and what isn't. That ambiguity invites abuse. Third, if a recipient does provide an "accurate description" of the evidence (whatever that is), it must provide "an equal opportunity to access" relevant evidence. The Supreme Court's due process jurisprudence demands more — that the student actually access

25

the evidence. The Final Rule imposes unfair barriers between students and their due process rights. This provision lacks rational justification and is therefore arbitrary and capricious.

### c. *Live Hearings and Questioning*

The Final Rule "will allow schools to decide whether to provide live questioning through a live hearing or through separate meetings with the parties." ECF No. 41 at 50; 89 Fed. Reg. at 33,894–95 (to be codified at 34 C.F.R. § 106.46(f)). The Department justifies stripping the accused of his right to confront live witnesses because "nothing . . . precludes a postsecondary institution from choosing to use a live hearing with questioning by an advisor, either because it is required under applicable Federal or State case law or for any other reason." 89 Fed. Reg. at 33,737.

The Department contradicts its prior 2020 Rule, which upheld the importance of live cross examination. *See, e.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 33,331 ("requir[ing] a recipient to step into the shoes of an advocate by asking each party cross-examination questions designed to challenge that party's plausibility, credibility, reliability, motives, and consistency" would place the recipient in the "untenable position of acting partially (rather than impartially) toward the parties, or else failing to probe the parties' statements for flaws the reflect on the veracity of the party's statements").

The Department argues that this contradiction is reasonable because individual recipients can still utilize live cross examination. ECF No. 41 at 49–51. But it does not explain how this proposal safeguards the accused's right to challenge the accuser's credibility. In short, the Final Rule did not justify its "findings that contradict" the 2020 Rule. *Fox*, 556 U.S. at 515.

26

#### d.  Standard of Proof

The Final Rule permits recipients to utilize the preponderance of the evidence standard of proof for the following purposes:

> to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred.

89 Fed. Reg. at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)). While some Fifth Circuit judges understandably disapprove of the preponderance standard in the Title IX context, *Plummer v. University of Houston*, 860 F.3d 767, 782 n.11 (5th Cir. 2017) (Jones, J., dissenting), no majority has disallowed it. And the Final Rule correctly states that many other courts approve. *See* 89 Fed. Reg. 33,701 (citing cases). Applying the preponderance standard here cannot be said to be so unreasonable as to be arbitrary and capricious.

#### e.  Initiation of Complaint

A Title IX coordinator may consider "eight non-exhaustive factors" in determining whether specific facts warrant an investigation in the absence of a complaint. ECF No. 41 at 48 (citing 89 Fed. Reg. at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)(A)(1)–(8))). On these bases, the Department admits that "a school may initiate a complaint based on an oral complaint or, under extraordinary circumstances, no complaint at all." ECF No. 41 at 48.

Plaintiffs argue that the foregoing "allow[s] an investigation to begin without any formal written complaint," which "empowers Title IX coordinators to go beyond their mandatory reporting duties and to police activities on campus that they think constitute sex discrimination." ECF No. 16 at 45. This is arbitrary and capricious, per Plaintiffs, because the Department "failed to reasonably address the extraordinary implications of these changes . . . ." *Id.*

27

Not so. As the Department explains, "the Rule and its eight non-exhaustive factors provide more clarity than the 2020 Amendments about the circumstances in which a Title IX Coordinator should initiate the grievance process, which is one reason the Department decided to make this change." ECF No. 41 at 48 (citing 89 Fed. Reg. at 33,594). Plaintiffs may disfavor this change, but the Department reasonably addressed these concerns and erected safeguards regarding when a complaint may be brought. This specific rule is not arbitrary and capricious.

### II.  Plaintiffs will suffer irreparable injury without injunctive relief.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that the harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, a plaintiff "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.*

Plaintiffs allege irreparable injury based on (1) compliance costs and (2) loss of federal funding. ECF No. 16 at 48–52. Defendants summarily respond that these alleged injuries are "speculat[ive]," rest on "unfounded fears," and are neither "realistic" nor "imminent." ECF No. 41 at 55–56 (internal marks and citations omitted).

Defendants are mistaken because at least one of these injuries must occur. On the one hand, Plaintiffs insist that they will not comply with the Final Rule. *See* ECF No. 16 at 52 ("Because Texas has and allows policies that conflict with the Final Rule, it and its components face Title IX funding losses should the Final Rule remain in place."); *see also* Letter from Greg Abbott, Governor of Texas, to Chairman and Regents of the University of Texas (May 8, 2024) (on file at https://gov.texas.gov/uploads/files/press/Texas_Regents_Title_IX.pdf) ("As I have already made clear, Texas will not comply with President Joe Biden's rewrite of Title IX . . .

I instructed the Texas Education Agency to ignore President Biden's illegal dictate of Title IX. Today, I am instructing every public college and university in the State of Texas to do the same."); *cf.* 89 Fed. Reg. at 33,542 (stating that the Final Rule displaces contrary state and recipient laws and policies). That would trigger the Final Rule's disciplinary provisions that will strip Texas recipients of federal funding. *See* 20 U.S.C. § 1681 (conditions on federal financial assistance).

Loss of federal funding would devastate the State of Texas. In the 2021–2022 biennium, Texas received roughly $6.6 billion in federal funds for K–12 education. ECF No. 16 at 49. In 2022, Texas postsecondary educational institutions received roughly $2.5 billion in federal funding; public universities received $3.8 billion; community colleges received $2.1 billion; technical educational institutions received over $100 million; and health-related educational institutions received more than $1.5 billion. *Id.* at 50–51. In fiscal year 2023, Texas public schools received roughly $9.4 billion in federal funding distributed by the TEA and an additional $4.8 billion in federal disbursements. *Id.* at 49. The government plans to enforce the Final Rule and Texas refuses to follow it.

The foregoing — billions of dollars per year — will likely cripple "the State's entire higher education network [which] includes 148 public institutions and currently enrolls approximately 1.4 million students." *Id.* at 50. For example, "[i]nstitutions that lose their federal funding will need to eliminate certain educational services if they cannot find alternative funding sources." *Id.* (citing ECF No. 16-1 at 5, 7–8, 10). To continue operations in accordance with its intention to ignore the Final Rule, Texas would need at least $13 billion per year to cover its losses in federal funding. "Irreparable injury" here is an understatement — not hyperbole.

On the other hand, Plaintiffs can expect irreparable compliance costs if they follow the Final Rule. *See Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("complying with a regulation

later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs") (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). A Plaintiff "need not convert each allegation of harm into a specific dollar amount." *Career Colleges*, 98 F.4th at 236 (internal marks omitted). And "alleged compliance costs need only be more than *de minimis*." *Id.* (internal marks omitted).

The Department acknowledges that recipients must "updat[e] policies or training materials" and host trainings for employees and Title IX coordinators. 89 Fed. Reg. at 33,867, 33,876 (discussing 34 C.F.R. § 106.31(a)(2)). These updates and training sessions necessitate "substantial expense" and "other compliance-related costs." ECF No. 16 at 48 (citing 89 Fed. Reg. at 33,867, 33,876). Plaintiffs' efforts here must "involve but [would] not [be] exhausted by hiring staff to perform compliance reviews, facilitate the Title IX grievance process, and respond to lawsuits that stem from allegations of liability under Title IX protections." ECF No. 16 at 52 (citing ECF No. 16-1 at 11–12). These costs "will likely increase when the Department adopts new regulations that create additional requirements or make existing requirements more demanding." *Id.* Overall, "the Department estimates more than $98 million in short-term compliance costs, some of which will fall on Texas schools." *Id.* (citing 89 Fed. Reg. at 33,861).

But "[a]t most," per the government, "these generic statements state the obvious: a new regulation will likely require regulated parties to undertake *some* activities to assure compliance." ECF No. 41 at 56. Where a regulation is otherwise valid, the government has a point. But not here, because the Final Rule is arbitrary and capricious on the numerous grounds explained *supra*. Hence, Plaintiffs would likely have to "comply[] with a regulation later held invalid." *EPA*, 829 F.3d at 433. Such compliance "almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.*

Irreparable harm is almost always the case because Plaintiffs would suffer a double-compliance cost. Because this Court finds that the Final Rule is likely arbitrary and capricious, the Final Rule is likely to be held invalid. Thus, should the Court offer no relief at this juncture, and Plaintiffs did comply, they would overhaul their Title IX infrastructure on August 1, 2024. But if the Final Rule is potentially held invalid, Texas would need to reverse course, which would likely require equal if not greater compliance costs. Without relief, a compliant Texas would suffer messaging dysfunction throughout its recipient institutions in addition to millions of wasted compliance dollars.

In conclusion, Plaintiffs *must* suffer at least one form of irreparable injury. If they don't comply — they intend not to — they must produce at least $13 billion per year to uphold Texas's current education system. Or millions of Texas students suffer the consequences. If they do comply, and the Final Rule is later held invalid, they suffer double compliance costs — likely millions in total. Hence, Plaintiffs have demonstrated irreparable injury at this stage.

### III.  The public interest and balance of equities favor Plaintiffs.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Likelihood of success on the merits and irreparable harm are the two most important factors in the analysis for preliminary relief. *See Career Colleges*, 98 F.4th at 239 (likelihood of success on the merits); *Mock*, 75 F.4th at 587 n.60 (same). Defendants thus "face[] a high hurdle" in establishing that the remaining two factors weigh against granting relief. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

Granting a preliminary injunction here would ensure "that Texas may continue to enforce its laws and policies without risking the loss of Title IX funding." ECF No. 16 at 57. And the public interest would be served "by preventing the loss of federal funds to Texas's educational

institutions." *Id.*; *see Career Colleges*, 98 F.4th at 254–55 ("Evidence . . . shows that a failure to stay the Rule would significantly constrain schools' operations and prevent them from devoting resources to educating their students, upgrading facilities, and constructing new ones . . . . Such a consequence would harm the public at large."). And "there is generally no public interest in the perpetuation of unlawful agency action." *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (internal marks omitted); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

### CONCLUSION

Based on the foregoing review, the Court **GRANTS** Plaintiffs' Motion **IN PART**. Pending final resolution of this case, Defendants are therefore **ENJOINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024), which is scheduled to take effect on August 1, 2024. This preliminary injunction is limited to Plaintiffs Daniel A. Bonevac, John Hatfield, and the State of Texas.

It is **FURTHER ORDERED** that no security is required to be posted by Texas or individual Plaintiffs under Federal Rule of Civil Procedure 65.

**SO ORDERED**.

July 11, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE